The People of the State of New York ex rel. Metropolitan Jockey Club, Relator, against William W. Mills et al., Constituting the Tax Commission of the City of New York, Respondents.

The People of the State of New York ex rel. Metropolitan Jockey Club, Relator, against Harry B. Chambers et al., Constituting the Tax Commission of the City of New York, Respondents.

Supreme Court, Special Term, Queens County, May 15, 1947.

*David Brown* and *Casper Gottdiener* for relator.

*Charles E. Murphy, Corporation Counsel (Rosemary Boylan* of counsel), for defendants.

HALLINAN, J.. Relator is the owner of a parcel of land in the county of Queens, City of New York, upon which it conducts a race track. The land, which lies in a community predominantly developed with one-family houses, is approximately 136½ acres in area. The improvements thereon consists of a grandstand and clubhouse, a paddock and an administration building, all newly built in 1941; twenty-two frame stables, about forty-five years old; fourteen cottages used by the grooms as living

quarters, and one or two other small frame buildings, there being in all about fifty buildings on the premises.

The city assessed the property for the year 1945–1946 at $2,955,400, of which $1,757,400 was allocated to the land and $1,198,000 to the improvements. For the year 1946–1947 the total assessment was $2,962,400, being an increase of $6,000 in the valuation of the land and $1,000 in the valuation of the improvements.

By certiorari proceedings the relator has challenged the total assessment for each year, claiming that the land has been overvalued in each case. By an order of this court, entered on consent, the proceedings for both years were consolidated and tried together.

The relator's expert, Hosinger, is a realtor of many years' experience in Queens County as a broker and appraiser. He adopted the city's valuation of the improvements and testified only as to the value of the land. He believed that if the property were not used as a race track its next best use would be for the construction of one-family houses. He did not believe that it could be developed as a garden apartment in the manner of Parkchester or Fresh Meadow, because it is approximately one mile from the Idlewild Airport, which would preclude the type of construction used at Fresh Meadow and Parkchester. There the buildings range in height up to thirteen stories. Because of the proximity of the Idlewild Airport, the maximum height of buildings which could be constructed on relator's property would be sixty or seventy feet. He considered the sale of other parcels of property in the immediate vicinity, including one parcel known as "The Jones Place." This parcel, comprising sixteen and one-half acres, is contiguous to the relator's property adjoining it on the south. It sold at a price averaging $3,800 per acre. In making his appraisal he established the value of a unit lot in each block, added 50% for corners, 10% for key lots, 10% for plottage, added in the cost of street paving and sewers, and then added 5% of this total for landscaping and 10% for use to arrive at his final appraisal for each block. His total appraisal for the land was $1,021,600, which was an increase of 16% over the valuation of the previous year, and averages $7,484 per acre.

The city's first land expert, Trump, is a builder with considerable experience in the construction of one-family homes in the borough of Brooklyn. He agreed with the relator's expert that buildings in excess of sixty feet in height could not be con-

structed here because of the proximity of Idlewild Airport. In making his appraisal he did not consider other sales in the vicinity, not even the adjacent Jones parcel, because he regarded them too small to be comparable. He was unable to estimate the value of a 20x100 foot lot. To him a great deal of the value of relator's property lies in the fact that it consists of 136 acres, an area which it would be difficult to assemble, but he was unable to say what percentage he had allowed for plottage. He appraised the land for both years at $2,701,000, which amounts to almost $20,000 an acre, but he admitted he knew of no sale of land in Queens County at $20,000 an acre. His estimate of the value seems to have been based on his own opinion that he could develop it for small homes and make a profit.

The City's second land expert, White, had extensive experience in real estate in Manhattan. He had purchased land in Queens County himself but said that this was of no aid to him in appraising relator's property. He did not use any basic unit value in making his appraisal, and, therefore, did not know the value of a plot of any size on Baisley Boulevard or New York Boulevard, two principal thoroughfares abutting on relator's property. He testified that the neighborhood was primarily zoned residential but that the race track had been established before zoning ordinances had become effective so that it was permitted to stay there. He believed the property's best use was as a cemetery, its second best use as a race-track, and that it could also be profitably developed as a garden-type apartment. He likewise had not considered any sales within a mile or two of the relator's property. He considered the sales of the St. Albans Golf Club, the Fresh Meadow Golf Club, the Queens Valley Golf Club and the Halleran site, which he thought to be comparable because of their size. He testified that Fresh Meadow was sold for about $7,450 per acre, but he estimated that relator's land was worth 50% more, bringing it up to $11,175 per acre; that the cost of grading and filling would run about $7,500 an acre more; preparing it for a race track would add about $2,500 an acre, and adding in something for zoning, he brought the value of Fresh Meadow, if developed as a race track, up to $23,000 an acre. He knew that the St. Albans Golf Club (123 acres) sold in 1942 for $550,000, or about $3,700 an acre. He testified that the Queens Valley sale was made in 1938 for $7,500 an acre. He appraised the relator's property at $2,000,000 or approximately $15,000 an acre, although he knew of no actual sale at that price in this area. By capitalizing the relator's

income as a check on his appraisal, he found the value to be still greater.

The relator did not question the city's valuation of the improvements. The city contended, however, that since only the total assessment could be challenged it had the right to show that the improvements were undervalued in order to compensate for any overvaluation of the land. Accordingly, evidence was received as to the value of the improvements.

Guida, the city's expert on this phase of the case, had, at one time, been engaged in the building business. He had not constructed any large building for the last ten or twelve years, and since 1932 has mainly been engaged in alteration work. He studied the plans on file in the Building Department and agreed with the other experts that the structures were suitable for the purpose for which they were built, but could not be used for any other purpose. He estimated the depreciated reconstruction cost of these buildings. Since there was no free market in building materials as of January 25, 1945, he computed the reproduction cost as of 1941 which he said was the last year in which there had been a free market. He depreciated the 1941 reconstruction prices to obtain the sound value of the improvements in 1945. By this method he determined the value of the buildings to be $1,617,200 for the first tax year. He varied his method slightly to obtain the sound value for the second tax year, which he estimated to be $1,800,000, or an increase of $182,800. Naturally, as he admitted on cross-examination, if he had used the same method, the second year's value should be lower because of the depreciation for the additional year. But he estimated that building costs had risen 20% and he, therefore, added 20% to the 1941 reconstruction figures, from which he deducted an additional year's depreciation. He used this method in determining the second tax year's valuation, because he believed there was a free market in January of 1946. On questioning, however, he qualified this by saying that a free market existed only in a limited way and admitted there was a black market in lumber.

It is quite a coincidence that the year 1941, which Guida considered the last year of free markets, was the year in which the principal improvements were actually built, and in rebuttal the relator produced the president of the corporation which constructed the improvements in 1941. This witness, Vogt, testified that the cost of the new grandstand and buildings erected in 1941 was $810,005. This figure did not include the electrical work, the plumbing or the heating and ventilation,

but it did include painting and decorating (except for the lobby and dining room), sales tax and the demolition of the old grandstand. Guida had estimated the cost of the seats at $97,440; Vogt testified that they were installed at a cost of $44,097. In this connection see *People ex rel. National Exhibition Co.* v. *Miller* (263 App. Div. 799, affd. 288 N. Y. 698), where seats at the Polo Grounds valued at $75,000 were held to be personalty and not a taxable improvement.

The city's two land experts, Trump and White, adopted Guida's valuation of the buildings. They admitted that if Guida's appraisal was incorrect, theirs also would be incorrect. Thus, their testimony as to improvements is hearsay and without probative value. Guida's testimony was the sole evidence adduced by the city. As pointed out, it was contradicted by the president of the firm which actually constructed the improvements and knew the cost thereof in 1941, the time as of which Guida estimated them. Relator's expert, Hosinger, had adopted the city assessors' valuation of the buildings.

In view of the testimony on this point, the court is of the opinion that the improvements were properly assessed for both years and that the presumption of correctness which an assessment enjoys was not rebutted by the city, which alone attacked the assessors' valuation of the improvements.

The review of the land valuation presents a more difficult problem for solution. As indicated in the summary of the testimony above, there was a vast difference of opinion among the experts, but expert testimony is not conclusive and its weight is for the trier of the facts to determine (*Gallagher* v. *New York Dock Co.*, 19 N. Y. S. 2d 789, 801, affd. 263 App. Div. 878, motion for leave to appeal denied 288 N. Y. 737).

A study of the assessment of relator's land shows a gradual increase as follows:

| Year | Land Assessment | Amount of Increase | Rate of Increase |
|------|-----------------|--------------------|------------------|
| 1940 | $ 696,400 | . . . . . . | . . . . . . |
| 1941 | 763,400 | $ 67,000 | .0962% |
| 1942 | 824,000 | 60,600 | .0793% |
| 1943 | 880,000 | 56,000 | .0679% |
| 1944 | 880,000 | . . . . . . | . . . . . . |
| 1945 | 1,757,400 | 877,400 | .9970% |
| 1946 | 1,763,400 | 6,000 | .0034% |

The 100% rise in the 1945 land assessment after the more moderate gradual increase for the previous five years can be

explained only by the fact that all of the city's experts in making their appraisals considered the relator's income. While this explains the large increase in the assessment, it does not justify it, unless the income is derived solely or principally from the use of the land as distinguished from relator's business enterprise.

Since the advent of pari-mutuel betting, large throngs attend the racing meets and vast sums are bet on the races. Perhaps there is not a day on which at least $1,000,000 is not wagered, and on many days the mutuel turnover reaches a figure of two, three or even four million dollars. Fifteen percent of the amount bet is deducted and distributed as follows: 6% to the State of New York as taxes; 5% to the City of New York as taxes; 4% to the relator. Naturally this produces large revenues, and unquestionably, even after deducting expenses, relator makes a substantial profit. But it is the racing and the betting which produce this money, rather than the land. Unlike an office building, or an apartment house, the relator's land is not used by tenants for the space itself. No evidence was offered as to rent derived from concessions, if any there be.

Real property must be assessed at its full value (Tax Law, § 8), but its full value is the value at which it will sell under ordinary circumstances. (Administrative Code of City of New York, § 158–1.0, subd. [b].) Where real property, because of its peculiar nature has no ready resale value, other tests of full value may be applied. (*People ex rel. Parklin Operating Corp.* v. *Miller,* 287 N. Y. 126.) Thus, at times, income may be considered provided the income is derived from the land. As was said in *People ex rel. Parklin Operating Corp.* v. *Miller* (*supra,* p. 131): "* * * the income that can be obtained from rentals of space bears some relation to the supply of space available in similar buildings * * *."

But it will be noted that it is income derived from *rentals of space,* not from the business conducted thereon which is to be considered.

Bonbright in his Valuation of Property (Vol. 1, p. 217) says: "In taxation, intangible assets like good will have frequently been valued by reference to the excess earning power of the proprietor's business; but real estate and chattels have only rarely been valued in this way, except that earnings in the form of rentals are usually taken into account."

The reason for limiting the capitalization theory to rentals is apparent from the opinion of the Court of Appeals in *People ex rel. Delaware, L. & W. R. R. Co.* v. *Clapp* (152 N. Y. 490)

where the court said at page 495: "An assessment of the portion of the real estate of a railroad which is within the town and subject to the jurisdiction of the assessors, upon the basis of the income or profits of the whole system of which it is a part, must necessarily include the use of franchises and personal property which are otherwise assessed, and hence such a principle of valuation must, in some measure at least, impose double taxation. It is doubtless within the power of the state to authorize such a method of assessment, but it has not attempted to exercise such a power. The real estate, the personal property *and the business and franchises* are taxable under different statutes, and these three elements *into which the corporate property is divided should not be commingled when it is reasonably possible to avoid it.*" (Italics supplied.)

And again at page 497: "The assessment of the real estate upon a basis of profits or income of the whole railroad must necessarily attribute to the real estate a value which should be shared with the personal property and franchises."

Where value was determined from income, the cases involved the rental of space. (See *People ex rel. Parklin Operating Corp.* v. *Miller, supra,* where the building was erected " for use as a store, office and loft building "; *People ex rel. Hotel St. George Corp.* v. *Lilly,* 45 N. Y. S. 2d 599, revd. 268 App. Div. 830, revd. 293 N. Y. 898, where the property was a hotel with stores and concessions; *People ex rel. 19 Rector St. Corp.* v. *Miller,* 263 App. Div. 800, affd. 288 N. Y. 709, where the property was an office building in lower Manhattan; *People ex rel. Allied Owners Corp.* v. *Sexton,* 257 App. Div. 215, affd. 281 N. Y. 853, where the court considered " the true rental value of the theatre portion of the building * * * in connection with the evidence of gross and net returns from the office building portion of the structure * * *.")

The court is of the opinion that while real estate values in this city increased they did not increase to the extent claimed by the city in this case. The approximate 100% increase in the 1945–1946 and 1946–1947 land assessments of the relator finds no support in the evidence. An increase for the two years to the sum of $1,320,000 for each year under review is more consistent with the facts as developed at the trial.

Accordingly, the assessment for the land for the two years under consideration is reduced to $1,320,000 for each year under review, and the assessment of the improvements is fixed at the value placed on them by the city assessors, to-wit, $1,198,000 for the year 1945–1946, and $1,199,000 for the year 1946–1947,

making total assessments of $2,518,000 and $2,519,000 for the respective years.

The court expresses its appreciation of the excellent briefs submitted by counsel, as well as the tables and other data prepared by them. They were of invaluable help.

Proceed on notice.