[909 NYS2d 493]

In the Matter of MIRIAM OSBORN MEMORIAL HOME ASSOCIATION, Respondent-Appellant, v ASSESSOR OF CITY OF RYE et al., Appellants-Respondents.

Second Department, October 12, 2010

120

## APPEARANCES OF COUNSEL

*Kristen K. Wilson, Interim Corporation Counsel,* Rye, and *DelBello DonnellanWeingarten Wise & Wiederkehr, LLP,* White Plains, for Assessor of City of Rye and others, appellants-respondents.

*McDermott Will & Emery LLP,* New York City (*Robert A. Weiner, Lisa A. Linsky,* and *Daniel G. Vincelette, P.C.,* of counsel), for Rye City School District, appellant-respondent.

*Cadwalader, Wickersham & Taft, LLP*, New York City (*Brian T. McGovern, Matthew S. Fenster*, and *Benjamin Kraus* of counsel), and *Watkins & Watkins LLP*, White Plains (*John E. Watkins, Jr.*, and *Liane V. Watkins* of counsel), for respondent-appellant (one brief filed).

**OPINION OF THE COURT**

CHAMBERS, J.

On this appeal we are called upon to determine whether the denial of a 100% charitable use tax exemption and the grant of a partial hospital use tax exemption with respect to the real property of the petitioner, Miriam Osborn Memorial Home Association (hereinafter the Osborn), was proper. We are further asked to determine whether the valuation of the Osborn's real property was correct. We conclude that, although the Osborn's request for a 100% charitable use tax exemption was properly denied, the partial hospital use tax exemption should also have been denied, but that the trial court's valuation of the subject property was correct.

I. <u>Introduction</u>

From 1908 until 1996, the Osborn enjoyed a 100% charitable use tax exemption with respect to the subject property. In 1997, however, the Assessor of the City of Rye (hereinafter the Assessor) revoked the Osborn's tax exempt status. Ultimately, the Board of Assessment Review of the City of Rye (hereinafter the BAR) restored the Osborn's tax exempt status, but only partially, to the extent of a 20.8% reduction in the assessed value of the property for the years 1997 through 2001, and an 18.04% reduction in the assessed value of the property for the years 2002 and 2003. The Osborn thereafter commenced seven proceedings pursuant to RPTL article 7, one for each of the tax years at issue, 1997 through 2003, against the Assessor, the BAR, and the City of Rye (hereinafter collectively Rye), with the Rye City School District (hereinafter the RCSD) intervening in the proceedings. In its petitions, Osborn sought the restoration of its full charitable tax exemption. Alternatively, the Osborn sought a hospital use tax exemption. The Osborn further alleged that, even if its property was not fully tax exempt, its property had nonetheless been over assessed. The RCSD, upon being granted leave to intervene as a party respondent, defended the Assessor's determination to deny a full charitable tax exemption, and urged the Supreme Court to accept the Assessor's valuation of the property from 1997 to 2003 but, in effect,

cross-claimed against Rye, challenging the BAR's determination that the Osborn was entitled to a partial hospital use tax exemption.

The issue of the Osborn's tax exempt status proceeded to trial first. After 74 days of hearing evidence, the Supreme Court issued a 109-page decision and order, concluding that the Osborn was not entitled to a 100% charitable tax exemption, but that it was entitled to a partial hospital use tax exemption. Thereafter, a 22-day trial was held on the issue of valuation, which culminated in the Supreme Court's determination that the property had been overassessed, and that a refund for each of the tax years must be paid to the Osborn.

II. The Tax Exemption Trial

A. The Formation and Operation of the Miriam Osborn Memorial Home Association

Evidence was adduced at trial that Miriam Osborn (hereinafter Miriam) envisioned the creation of a home for aged women who had been left indigent by the deaths of their husbands. Miriam's husband, Charles Osborn, who had amassed a fortune as a Wall Street speculator, died at 45 years of age, in 1885. While Miriam was bequeathed a large share of his estate, she realized that many other widows were not as fortunate. According to the Osborn's historical documents, Miriam "saw the tragedy of the destitute single woman and the widow in the 1880s when there were no pensions or organized support whatsoever except for the few voluntary homes for the aging." She reportedly "knew the great fear gentlewomen had of untimely death or illness leaving them without support unless relatives or friends were able to provide a home." As a result, in Miriam's last will and testament, she provided for the establishment of the Miriam Osborn Memorial Home Association "for the relief of Respectable, Aged, Indigent Females." Miriam appointed her friend and lawyer, John Sterling, as trustee under her will, and directed him to incorporate the Miriam A. Osborn Memorial Home Association. On March 5, 1892, by special act of the Legislature, the Miriam Osborn Memorial Home Association was incorporated (see L 1892, ch 94). The stated general purpose of the Osborn was to provide a home and support, within the State of New York, for respectable, aged women in needy circumstances.

In April 1908, 16 years after its incorporation, the Osborn opened its first building, the Osborn Building, to 12 residents. By year's end, there were 21 women living at the Osborn. Ac-

cording to a 1913 application for admission to the Osborn, an applicant had to show that she was a "gentlewoman in needy circumstances, of good education and pleasant manners, at least 65 years of age, of sound mind and in good average health, and must present undoubted testimonials of high character and good disposition." An applicant was required to pay a $500 non-refundable fee. By 1936 the Osborn added two more buildings, the Strathcona Infirmary Building and the Sterling Memorial Building. In 1969 the New York State Department of Health issued the Osborn a license for operation of a skilled nursing and health-related facility.

In the meantime, the Osborn established three categories of residents. The first category, type A residents, paid a monthly fee in exchange for room and board. However, according to their contracts with the Osborn, type A residents would not have to leave the residence facility after they exhausted their financial resources. The second category, type B, or scholarship residents, were indigent and were fully supported through the Osborn's endowment fund. The third category, Type C, or assignment residents, assigned their assets to the Osborn in exchange for lifetime care. The Osborn provided all of its residents with three levels of health care, depending on their requirements: skilled nursing, assisted living, and managed care.

B. The Pathway 2000 Plan

By the late 1980s, the Osborn's financial condition had seriously deteriorated. There was a gross imbalance between the combined number of type B and type C residents, on the one hand, which totaled more than 50% of the Osborn's 144 residents, and the number of paying residents, on the other. Thus, the Osborn had to spend its endowment principal in order to cover its operating losses. Based on the rate at which the Osborn was spending from its endowment, Mark Zwerger, chief executive officer of the Osborn, testified to his projection that the endowment fund would have been entirely exhausted by 1999 if spending at that rate had continued.

In addition, the Osborn presented evidence that its buildings were badly in need of renovation and remodeling. Building support systems, particularly the electrical system, needed to be upgraded. Original furnishings in the buildings were worn and needed to be replaced. Thus, due to this state of disrepair, it became increasingly difficult to attract new residents. In order to address these problems, Zwerger devised the Pathway 2000 Plan "to develop a continuing care retirement community and

preserve the original facilities of the Osborn." The plan described the continuing care retirement community (hereinafter CCRC) as "a residential location which provides a continuum of health services to older persons." According to Zwerger, since a CCRC would offer independent living, an "assisted living" level of care, and "skilled nursing" level of care for its residents on one campus, it was distinguishable from other senior citizen housing.

To determine the feasibility of its plan, the Osborn hired a consulting firm, Van Scoyoc Associates (hereinafter Van Scoyoc), to conduct an extensive market assessment. In a 200-plus-page report, Van Scoyoc concluded that a market existed for a CCRC, but only for "a small segment of the affluent elderly population." The targeted market, or those who "financially qualified" for the CCRC, was based on ability to pay a schedule of fees proposed by the Osborn. Under the proposed schedule, residents would be offered two general contracts involving different combinations of entrance and monthly fees. Residents would pay either a lump sum entrance fee that ranged from $175,000 to $218,750, plus an ongoing monthly fee that ranged between $1,450, and $2,050, or a monthly fee that ranged between $2,850 and $3,810. Although Van Scoyoc found sufficient "market penetration" to warrant further investigation of the proposed CCRC, given the relatively small number of qualified, one-person households consisting of persons aged 75 years old or older, Van Scoyoc suggested that the Osborn "assess options for moderating its entry fee requirements to broaden afford ability among this key market segment." Additionally, Van Scoyoc researched the types of facilities and amenities wealthy seniors would find desirable. It found that most seniors desired a CCRC with one-story, attached units, with access to health and nursing care services, and amenities such as restaurant dining and on-site garage parking. Van Scoyoc defined wealthy seniors as those with a median monthly income of between $4,000 and $4,250, median assets of between $500,000 and $750,000, and a median home value of between $325,000 and $350,000.

Thereafter, based upon Van Scoyoc's recommendation, the Osborn hired KPMG Peat Marwick (hereinafter KPMG) to conduct a financial feasibility study. Around the same time as KPMG was preparing its financial feasibility study, the Osborn froze the admission of type B residents, reaffirmed its commitment not to take residents eligible for and receiving Medicaid,

and removed the provision in the type A resident contract that such a resident would never have to leave because of inability to pay. In KPMG's report, it took into account that the number of type B residents would decrease from 63 in 1991 to 22 in 1999, and thereby reduce the Osborn's actuarial liability.

In 1991 the Osborn Board of Trustees adopted plans to proceed with Pathway 2000.

C. Construction and Marketing of the New Osborn

The total cost of construction, completed in two phases, was $135 million. The cost was financed through tax exempt bonds that were to be paid off with funds generated from the entrance fees the Osborn charged its residents.

In phase one of the construction project, the Osborn renovated the Osborn Building, the Strathcona Building, and the Sterling Building (hereinafter collectively the original buildings), and constructed new buildings and facilities. Between the three original buildings and the 105 residential units used as assisted living or independent rental units, the Osborn underwent "a complete renovation." New residential structures, designated as the 2000 Building and the Garden Homes, were constructed, which together became known as Sterling Park at the Osborn. The 2000 Building contains 54 independent living units (40 two-bedroom units and 14 one-bedroom units), while the Garden Homes have 26 units, all containing two bedrooms. The Osborn Clinic, which was later rented out to the for-profit Westchester Medical Group, was relocated from one part of the original buildings' site to another. Additionally, the Osborn constructed the Pavilion, a skilled nursing facility containing 84 beds on two floors, with two bathing areas, four cluster lounges, two nursing stations, and a dining room.

In phase two of the construction project, the Osborn constructed structures designated as the 3000 Building and the 4000 Building, consisting of 94 independent living units, as well as various amenities and features such as a courtyard dining room, billiard room, theater, and multi-media library. Another 12 garden homes were also constructed.

Meanwhile, as the construction was in progress, the Osborn began marketing its new facilities to, as Zwerger testified, "the age income qualified population," spending the total sum of $3.1 million between 1997 and 2003 on its efforts. GlynnDevins, a marketing research consultant, designed a strategic marketing plan directed at the elderly and their adult children living in

high-income zip codes. The marketing plan included direct mail and advertising, which highlighted the various amenities and new facilities.

D. The Residents of the New Osborn

Residents in the 188 independent living units located in the Garden Homes and the 2000, 3000, and 4000 Buildings are required to pay entrance and monthly fees and be in good health.

The entrance fees are allocated to the payment of debt service for the Pathway 2000 project, and are refunded to the residents or their estates if they leave or die after their housing unit is re-occupied. The Osborn characterizes its entrance fees as "no-interest loans" from its residents, and informs residents that the interest or investment income earned on entrance fees will be used to pay operating and capital costs. In 1997 entrance fees ranged from $229,000 to $505,000 and, by 2003, the entrance fees ranged from $301,400 to $825,000. In 1997 monthly fees ranged from $1,850 to $2,500, while in 2003, they ranged from $2,595 to $3,741.[1] The Osborn reserves the right to terminate a resident's contract for failure to pay monthly fees. By the time of trial, however, only two of the Osborn's residents who had passed the Osborn's actuarial test prior to admission had exhausted their assets.

In addition to having sufficient assets to pay for the entrance and monthly fees, a resident of one of these independent living units must be healthy. In fact, the Osborn requires prospective residents of independent living units to sign an agreement warranting that he or she is "capable of independent living [and] has no medical condition which would endanger himself/herself or other person." Once admitted, and on a yearly basis thereafter, residents must consent to a physical examination performed by a physician selected by the Osborn to determine their possible future health care needs. Medical and nursing care is not provided for these residents.

Residents in the 105 units located in the original buildings use them as either independent living units or assisted living units. The residents in these independent living units do not pay an entrance fee; however, they pay monthly fees that, in 1997, ranged from $2,400 to $4,300, and from $4,436 to $5,352

---

1. Some of the costs covered by the monthly fees include an executive chef paid more than $100,000 annually, one dozen cooks and preparatory cooks, high-end food items such as Angus beef, caviar, and lobster, and expensive works of art.

by 2003. In 1997 the residents in the assisted living units paid monthly fees that ranged from $3,600 to $4,950, and, by 2003, from $4,959 to $6,624. Additionally, these assisted-living residents pay a $1,400 to $1,500 fee to Sterling Home Care, Inc., for basic assisted living services, and must then pay on a fee-for-service basis for supplementary care and services such as skilled nursing visits, medical administration, and coordination of services.

Currently, 73% of the applicants (252 seniors) placed on the waiting list for independent living units have an individual or joint net worth with their spouses of between $2 million and $25 million. No applicant on the waiting list has a net worth of less than $325,000. Forty-nine percent of the applicants on the waiting list for the assisted living units have an individual or joint net worth with their spouses of between $2 million and $25 million. Another 45% have either an individual or joint net worth with their spouses of between $1 million and $2 million, or guarantees in excess of $1 million.

To be eligible for direct admission into the Pavilion, the skilled nursing facility, prospective residents must demonstrate that they are financially able to pay for the cost of their care in accordance with the Osborn's actuarial model.[2] The Pavilion's stated policy is that "[a]pplicant's [sic] who fail to meet the financial criteria for admission may be admitted if there is sufficient funds from the Osborn's endowment fund to subsidize the cost of care for the applicant." However, under the Osborn's "Charity Policy," subsidies are only provided "to those individuals who currently reside elsewhere on the Osborn's campus." Thus, members of the general public who seek direct admission are not eligible for subsidized care at the Pavilion. In addition, the Osborn accepts Medicare, but not Medicaid, payments for residents receiving care at the Pavilion.[3] Of the approximately 600 nursing homes in New York State, the Osborn is possibly the only nursing home that does not accept Medicaid.

As a result of the Osborn's decision in 1990 to freeze admission of type B or scholarship residents, both the number of type

---

2. Residents admitted to the Pavilion do not have to pay an entrance fee.

3. Medicare (42 USC § 401 et seq.) is a federal program that provides reimbursement for the medical expenses of persons eligible for Social Security benefits. The Medicaid program (42 USC § 1396 et seq.; Social Services Law § 363 et seq.), in contrast, pays for medical and health services supplied to individuals who fall below a certain income threshold (see Matter of Visiting Nurse Serv. of N.Y. Home Care v New York State Dept. of Health, 5 NY3d 499, 502-503 [2005]).

B residents and the concomitant percentage of total residents who are classified as type B have steadily declined. In 1990 the Osborn had 63 type B residents, which represented nearly 44% of its total residents. By 2003, the Osborn increased its total number of residents to 411, but only had 23 type B residents. In 2001 the Osborn convened a Charity Task Force to develop a charity policy that would allow it to pursue the Osborn's historical mission while sustaining the financial viability of its operations. The Charity Task Force issued a final report with a series of recommendations, which were adopted by the Osborn Board of Trustees on February 12, 2002. The Task Force recommended that the "total funds budgeted for charity expenditures annually not exceed 5% of the estimated principal balance of the endowment fund as of the beginning of any given year."

The Charity Task Force report stated that the Osborn had saved itself from "certain financial ruin." For the fiscal period ending December 31, 2003, the Osborn had more than $30 million in its endowment fund, as the fund increased by the sum of $5 million from the previous year, and the fund was running a net operating surplus. Thus, the report concluded that the Osborn is "a thriving investment grade rated company."

III. The Decision after Trial on Charitable and Hospital Use Tax Exemption

In a decision dated December 30, 2006, the Supreme Court concluded that the Osborn was not entitled to any charitable use tax exemption. The Supreme Court noted that, under Real Property Tax Law § 420-a, the Osborn had to meet two requirements in order to qualify for a charitable use tax exemption: (1) the Osborn had to be exclusively organized for charitable purposes and (2) its property exclusively used for those purposes. The Supreme Court found that the Osborn satisfied the former, but not the latter. The Supreme Court, observing that, in 1989, nearly one half of the Osborn's residents were scholarship residents, stated that the Osborn may have once deserved a charitable use exemption. However, the Supreme Court explained that, over the years, the percentage of scholarship residents had dropped from 11% of the total resident population in 1997 to 6% in 2003. The Supreme Court noted that, during the same period, the health and wealth of the Osborn's other residents had "increased dramatically." As the Supreme Court explained, "[n]one of these percentages [was] sufficient enough to warrant a finding 'that a large percentage of the clients must be in need of and receive a real and

substantial charitable benefit' " (*Miriam Osborn Mem. Home Assn. v Assessor of City of Rye*, 14 Misc 3d 1209[A], 2006 NY Slip Op 52461[U], *54 [2006], quoting 10 Ops Counsel SBRPS No. 100). Accordingly, the Supreme Court concluded that the Osborn "does not deserve a charitable use exemption" (*id.*).

Nevertheless, the Supreme Court concluded that the Osborn was entitled to a partial hospital use tax exemption. The Supreme Court found that

> "[a]lthough The Osborn has transformed itself from a nursing home caring for indigent aged elderly into an extraordinary, state-of-the-art CCRC serving the needs of healthy and wealthy senior citizens, its Pavilion is still a skilled nursing facility licensed by the New York State Department of Health (*Miriam Osborn Mem. Home Assn. v Assessor of City of Rye*, 14 Misc 3d 1209[A], 2006 NY Slip Op 52461[U], *43).

Accordingly, the Supreme Court concluded that, "[a]s a licensed 'residential health care facility,' The Osborn is entitled to a hospital use exemption" (*id.*). The trial court went on to state

> "[that] [t]he importance of The Pavilion as a residential health care facility in the overall operation of the Osborn has been reduced and unlike [*Matter of*] *San Simeon* [*By The Sound v Russell* (250 AD2d 689 [1998])], is no longer the very essence of the nursing home it once was. *Instead The Pavilion is merely an adjunct to a much larger assisted and independent living complex of apartments, garden homes and amenities*" (*id.* at *44 [emphasis added]).

The matter then proceeded to trial on valuation.

IV. The Valuation Trial

At a nonjury trial, the parties produced the testimony and reports from their respective expert appraisers with respect to the issue of the valuation of the subject property.

A. The Osborn's Case

The Osborn called Bob Sterling of Sterling Appraisals, Incorporated, to testify as its expert appraiser.

In calculating the value of the Osborn's property, Sterling largely utilized the income capitalization approach, excluding the surplus land on the property, for which he utilized a comparable sales approach. Broadly speaking, for the years in question, Sterling arrived at his proffered value by: (1) gathering

comparable rentals to determine potential annual gross income; (2) deriving effective gross income by applying an estimated vacancy and collection loss rate to the potential annual gross income; (3) computing net potential income by subtracting estimated annual expenses for the subject property from effective gross income; (4) computing a capitalization rate for the subject property; and (5) capitalizing the annual net income to determine the market value of the property.

In determining the potential annual gross income of the property, rather than appraising the Osborn's property as a single integrated entity consisting of a CCRC located on a 56-acre campus, Sterling subdivided the property into smaller residential and commercial entities, and evaluated them by comparing those entities to similar properties. Thus, Sterling designated the Garden Homes, the original buildings, the 2000, 3000, and 4000 Buildings, and the Pavilion, as residential components of the Osborn. Sterling used the rents charged on comparable properties in and near the City of Rye, and converted the estimated revenue into a "market rent" for each of those components. Sterling did not use the monthly fees that the Osborn charges its residents because, as he explained, he found that those fees reflected not only the housing costs for the respective units, but the value of health care and other support services. Nor did Sterling use the entrance fees the Osborn charges some residents, or the interest earned thereon. To calculate the market value of certain areas outside of the residential components of the Osborn, which Sterling termed as office, kitchen, and back areas, totaling 50,000 square feet, Sterling, in similar fashion, applied the rent charged on comparable commercial properties.

After ascertaining the Osborn's potential annual gross income by considering the rent charged on similar properties, Sterling then calculated the appropriate vacancy and collection loss rate to be 3.5%. In arriving at that figure, Sterling started with the 2% actual vacancy rate that the Osborn experienced for the units in the original buildings, but discounted the vacancy rate, which he concluded was unrepresentative for the units in the Garden Homes and the 2000, 3000, and 4000 Buildings, whose residents are charged an entrance fee. He then further adjusted the actual vacancy rate to take into account the office and commercial space at the Osborn, which generally has a much higher market vacancy rate than residential apartments.

Sterling then determined the property's estimated operating expenses. He utilized the operating expenses derived from the

comparable properties he had identified, rather than relying on the Osborn's actual operating expenses.

In determining the appropriate capitalization rate, Sterling researched two sources for overall capitalization rates: the Korpacz Real Estate Investor Survey and a survey undertaken by the American Council of Life Insurance. After taking into account features of the property that made investment in it more risky and less attractive than property devoted solely to residential apartments, as well as land-use restrictions and a declining or flat rental market in Westchester County, Sterling modified the capitalization rates articulated in those two sources.

To calculate the overall capitalization rate, Sterling added the effective tax rate—a figure to which the parties stipulated—to the base capitalization rate. The net operating income, consisting of the potential annual gross income less the vacancy and collection losses (calculated as a percentage of potential annual income) and less operating expenses, was then divided by the overall capitalization rate, to which was added the value of the surplus land on the property, resulting in Sterling's calculation of the final market value of the subject property. The final market value was multiplied by the agreed-upon equalization rate to calculate the assessed value of the property for each of the subject tax years.

B. Rye's Case

Rye called Gerald V. Rasmussen, of Cushman & Wakefield of Connecticut, Incorporated, to testify as its expert appraiser,

Although Sterling and Rasmussen agreed that the income capitalization approach was the preferable method to employ for the valuation of the Osborn's property, they reached different conclusions and results in employing that method. In determining the Osborn's potential gross income, Rasmussen added the actual revenues generated by the Osborn through its resident fees, the interest earned on both the refundable entrance fees and the Osborn's endowment fund, the income generated on space the Osborn rents to third parties, and other income sources.

From this figure, for each of the tax years, Rasmussen deducted the Osborn's estimated operating expenses. In calculating estimated operating expenses, Rasmussen started with the Osborn's actual operating expenses, but determined that, even after excluding interest earned on entrance fees and endowment income for almost every tax year at issue, the actual

operating expenses were excessive, as they exceeded the Osborn's operating income. To correct for this apparent anomaly, Rasmussen looked to ratios of operating income to operating expenses of other CCRCs in order to reach what he characterized as a more reasonable estimate of the property's operating expenses.

Rasmussen then ascertained a rate of capitalization. In doing so, he utilized data reported in the Senior Care Acquisition Report published by Irving Levin Associates, Inc., findings reported in Cushman & Wakefield, Inc.'s Senior Care Participants Survey, and capitalization rates extracted from sales of other CCRCs—four in Florida and one in Arizona. Rasmussen added the effective tax rate to the capitalization rate in order to reach a tax-loaded capitalization rate.

To reach his final valuation, Rasmussen divided the net operating income, that is, the total operating income less the estimated operating expenses, by the tax-loaded capitalization rate, which he then rounded in order to reach a market value for the property for each of the tax years in dispute.

V. The Decision After Trial on Valuation

In its decision on the issue of valuation, made after trial, the Supreme Court, other than adjusting the capitalization rate, largely accepted the valuation of the Osborn's expert. Thus, the Supreme Court found that the property had been over assessed, and instead fixed the valuation of the property at $2,184,260 for tax year 1997, $2,480,000 for tax year 1998, $2,297,880 for tax year 1999, $2,318,400 for tax year 2000, $2,213,360 for tax year 2001, $2,103,300 for tax year 2002, and $2,133,120 for tax year 2003. After applying the partial hospital tax use exemptions to these figures, the Supreme Court determined that the taxable portion of the assessed value of the subject property was $1,729,934 for tax year 1997, $1,964,160 for tax year 1998, $1,819,921 for tax year 1999, $1,836,173 for tax year 2000, $1,752,981 for tax year 2001, $1,723,865 for tax year 2002, and $1,748,305 for tax year 2003, and directed payment of a refund to the Osborn, with interest, for each of the tax years at issue.

VI. Analysis

A. Tax Exemption

1. Charitable Use Tax Exemption

Real Property Tax Law § 420-a (1) provides,

> "Real property owned by a corporation or association organized or conducted exclusively for religious,

*charitable, hospital*, educational, or moral or mental improvement of men, women or children purposes, or for two or more such purposes, and used exclusively for carrying out thereupon one or more of such purposes either by the owning corporation or association or by another such corporation or association as hereinafter provided shall be exempt from taxation as provided in this section" (emphasis added).

Although there are several requirements that an entity must satisfy for it to be entitled to a charitable tax exemption (*see Matter of Miriam Osborn Mem. Home Assn. v Assessor of City of Rye*, 275 AD2d 714, 715 [2000]), in the instant case, the dispositive question is whether the Osborn's properties are exclusively used for charitable purposes. The term "exclusively" has not been interpreted literally (*see Matter of Adult Home at Erie Sta., Inc. v Assessor & Bd. of Assessment Review of City of Middletown*, 10 NY3d 205, 214 [2008]). Rather, the term "exclusively" means principally or primarily (*see Matter of Yeshivath Shearith Hapletah v Assessor of Town of Fallsburg*, 79 NY2d 244, 249 [1992]; *Matter of Holy Spirit Assn. for Unification of World Christianity v Tax Commn. of City of N.Y.*, 55 NY2d 512, 521 n 2 [1982]; *Matter of Association of Bar of City of N.Y. v Lewisohn*, 34 NY2d 143, 153 [1974]). "Hence, purposes and uses merely auxiliary or incidental to the main and exempt purpose and use will not defeat the exemption" (*Matter of Association of Bar of City of N.Y. v Lewisohn*, 34 NY2d at 153). Rye, as the municipality seeking to withdraw an existing tax exemption, bears the burden on this issue (*see Matter of Lackawanna Community Dev. Corp. v Krakowski*, 12 NY3d 578, 581 [2009]; *Matter of New York Botanical Garden v Assessors of Town of Washington*, 55 NY2d 328, 334; *Matter of Miriam Osborn Mem. Home Assn. v Assessor of City of Rye*, 275 AD2d at 716).

While there is no precise statutory definition of the term "charitable purpose," it has included the relief of poverty, the advancement of education, the promotion of health, and even the care and maintenance of abandoned and abused farm animals (*see Matter of Farm Sanctuary v Patton*, 221 AD2d 67, 68 [1996]). "For property to be entitled to an exemption on the ground that it is being used for a charitable purpose, it must a fortiori be used for a public purpose" (*Matter of North Manursing Wildlife Sanctuary [City of Rye]*, 48 NY2d 135, 140 [1979]).

Thus, "renting homes to elderly people who are not poor is not a 'charitable' activity" (*Matter of Adult Home at Erie Sta., Inc. v Assessor & Bd. of Assessment Review of City of Middletown*, 10 NY3d at 214 [also explaining that the provision of housing to poor people at below market rates is plainly a charitable purpose]; *see Matter of Greer Woodycrest Children's Servs. v Fountain*, 74 NY2d 749, 751 [1989] [real property being used as a retirement community for middle-income elderly did not qualify for a charitable use tax exemption under RPTL 420-a]; *Matter of Presbyterian Residence Ctr. Corp. v Wagner*, 66 AD2d 998 [1978], *affd* 48 NY2d 885 [property was not entitled to charitable use tax exemption where the tenants, senior citizens, paid substantial admission fees and regular rents and service charges designed to provide income to make the apartments self-sustaining]).

■ As the Supreme Court correctly determined, the Osborn is not entitled to a charitable use exemption. The overwhelming evidence established that admission to the Osborn is restricted to wealthy and relatively healthy senior citizens.

Since the institution of the Pathway 2000 Plan, the Osborn was fully transformed from an adult home for indigent elderly women to a full-scale CCRC designed to attract wealthy seniors with high-end housing units and amenities. During the course of that transformation, the Osborn specifically targeted wealthy seniors as potential future residents. It employed the assistance of a marketing consultant, Van Scoyoc, which determined that a market for a CCRC existed, but was limited to "a small segment of the affluent elderly population." This targeted market was identified based on ability to pay a one-time entry fee of between $175,000 and $218,750 and monthly service fees that ranged from $1,450 and $2,050, or a monthly fee of between $2,850 and $3,810. Then, with further assistance from GlynnDevins, its marketing research consultant, the Osborn advertised its new facilities by direct mail to seniors and their adult children living in high-income zip codes. Prior to admission, prospective residents must demonstrate, according to the Osborn's actuarial model, that they are financially qualified. Once accepted for admission and living at the Osborn, whether in independent living units or assisted living units, residents pay significant fees, either in the form of refundable entrance fees and monthly fees, or monthly fees only (*see Matter of Lake Forest Senior Living Community, Inc. v Assessor of the City of Plattsburgh*, 72 AD3d 1302, 1304-1306 [2010] [petitioner's prop-

erty was not being used for a charitable purpose where it was charging middle-income seniors at market rates without subsidy; residents were charged monthly rental rates from $2,075 to $2,483, or from $1,094 to $1,238 if the resident paid an equity deposit of between $73,500 and $94,760]). The Osborn now reserves the right to terminate a resident's contract for failure to pay monthly fees (cf. id. [although petitioner claimed a policy of not displacing residents if their finances became such that they were unable to pay rent, the petitioner's standard lease agreement contained no indication that a tenant would not be evicted upon an inability to pay]). Thus, the Osborn no longer promises, as it once had, that a resident would never have to leave because of inability to pay. However, it is unlikely that residents will exhaust their financial resources, as all applicants are prequalified against the Osborn's actuarial model. Indeed, by the time of trial, only two residents had exhausted their own financial resources. In all likelihood, when a resident leaves, he or she will be replaced with an applicant from the Osborn's waiting list, most of whom have assets in excess of $2 million.

As the number of wealthy residents living at the Osborn has increased, the number of residents relying on the Osborn's charity has decreased. While in 1990 nearly one half of the Osborn's residents were scholarship residents, by 2003 the scholarship residents comprised little more than 5% of the resident population. This is a direct result of the Osborn's decision to freeze the admission of scholarship residents between 1990 and 2002. Moreover, as recommended by its Charity Task Force, the Osborn limits charity expenditures to about 5% of the principal balance of the endowment fund.

Despite this evidence, the Osborn argues that it is entitled to a full charitable use tax exemption because it provides a continuum of care that meets the special needs of its elderly population. In this regard, the Osborn states that approximately 90% of its assisted living residents and approximately 50% of its independent living residents utilize the services of the Osborn's medical director or one of the other physicians at the Osborn's onsite medical clinic. However, residents must pay for these services (id. [in addition to housing elderly tenants, the petitioner provided an array of residential and supportive services tailored to address the special needs of the elderly; however, this did not make the petitioner's activity charitable because those residents paid for those services]). In fact, the Osborn informs its

residents that they "are free to retain, at their own expense, their own personal physician or retain the services of The Osborn's Medical Director or medical staff, who is on emergency call . . . The community is not financially responsible for your personal medical services or outside hospitalization." The "on-site medical clinic" is not affiliated with the Osborn. Rather, it is office space leased out to another entity, the for-profit Westchester Medical Group. As the Osborn's own clinical operations manager testified, a visit to the physicians at the Westchester Medical Group, other than being "very conveniently located," is no different than a visit to one's own doctor. Assisted living residents receive health care through the Osborn's separate corporation, Sterling Home Care, for which they pay the sum of $1,400 to $1,500 a month, which is in addition to the monthly fees they pay for their residential units. Further, assisted living residents must pay additional fees for services beyond the basic assisted living services package, which does not include skilled nursing visits, medical administration, or coordination of services. Notably, the Osborn does not accept Medicaid payments, a program designed to finance health care for low-income individuals.

The Osborn contends that Internal Revenue Service (hereinafter IRS) Revenue Ruling 72-124, which is not controlling authority (*see Matter of Weltman [Dempsey-Tegeler & Co.— Catherwood]*, 25 AD2d 914 [1966]), should guide our decision in any event. To the extent we have considered the factors articulated in that Revenue Ruling, we do not find the Osborn's reliance on IRS Revenue Ruling 72-124 to be persuasive under the facts of this case.

Pursuant to IRS Revenue Ruling 72-124, an organization is entitled to a charitable status income tax exemption under federal law if it satisfies three primary needs of aged persons: the need for housing, the need for health care, and the need for financial security.

As to the need for financial security, the IRS noted that this factor will generally be satisfied if two conditions exist: the "organization must be committed to an established policy, whether written or in actual practice, of maintaining in residence any persons who become unable to pay their regular charges," and "the organization must operate so as to provide its services to the aged at the lowest feasible cost" (IRS Rev Rul 72-124). The Osborn has not met either condition. The Osborn has revised its prior policy that a resident would never have to leave

because of inability to pay, and it can now require a resident to vacate his or her unit for failure to pay.

Further, the Osborn does not operate at the lowest feasible cost. One of Rye's experts, William Hecht, an accountant, testified that the Osborn was operating at "far from least possible cost." In general, Hecht noted, the Osborn has "high costs in all areas." In particular, the Osborn employs an executive chef who earns an annual salary in excess of $100,000, along with one dozen cooks and preparation cooks who together offer 45 entree choices, including high-end items such as Angus beef, caviar, and lobster. The Osborn's common areas are lavishly decorated with fresh flowers delivered weekly and numerous pieces of art, with more than $215,000 worth of art having been purchased between 1999 and 2003. As Hecht noted in his report, quoting a local journalist, "[t]he public spaces at the Osborn look like those in elegant hotels and the private rooms are as luxurious as an upscale home" (Lombardi, *Retirement Home Close to Home,* New York Times, Sept. 29, 2002, § 14WC, at 11).

The Osborn's reliance on an IRS private letter ruling is also misplaced (*see* IRS Priv Ltr Rul 200437036, 2004 WL 2016358, 2004 PLR LEXIS 623). Prior to that ruling, in IRS Revenue Ruling 79-18, the IRS added a third condition to the element of need for financial security, that "homes for the aged" be "within the financial reach of a significant segment of the community's elderly persons." Citing to that additional condition set forth in the cited private letter ruling, the IRS noted that the organization in that instance—one designed to own and operate a senior living community—had demonstrated that "its facility is reasonably available to a significant portion of the elderly in the community from which most of its residents move." (*Id.*) This is simply not the case with respect to the Osborn.

In short, the Osborn is largely limited to wealthy seniors, and the number of residents who do rely on the Osborn's charity are too few to support the conclusion that the Osborn's property is being used principally or primarily for a charitable purpose. Therefore, the Osborn is not entitled to a charitable use tax exemption.

## 2. Hospital Use Tax Exemption

As with the issue of the charitable use tax exemption, the starting point on the issue of the hospital use tax exemption is RPTL 420-a. Thus, in order to be entitled to a hospital use tax exemption, the Osborn's property must be principally or primarily used for that exempted purpose.

The Supreme Court, in holding that the Osborn was entitled to a hospital use tax exemption based on its skilled nursing facility, the Pavilion, found that "[t]he Pavilion is merely an adjunct to a much larger assisted and independent living complex of apartments, garden homes, and amenities" (*Miriam Osborn Mem. Home Assn. v Assessor of City of Rye*, 14 Misc 3d 1209[A], 2006 NY Slip Op 52461[U], *44). Although, in reviewing the Supreme Court's determination here, made after a nonjury trial, our discretion "is as broad as that of the trial court" and we "may render the judgment . . . warranted by the facts, taking into account in a close case the fact that the trial judge had the advantage of seeing the witnesses" (*Northern Westchester Professional Park Assoc. v Town of Bedford*, 60 NY2d 492, 499 [1983] [internal quotation marks omitted]), we discern no basis to disturb the Supreme Court's finding that the Pavilion is merely an adjunct to the entire complex at the Osborn.

However, having made that finding, the Supreme Court should have concluded that the Osborn was not entitled to any hospital use tax exemption. The rule is that property principally or primarily used for an exempted purpose is entitled to a full exemption. This includes even portions of the property that are devoted to a use which would otherwise be nonexempt, but is reasonably incidental to the major purpose (*see Matter of Yeshivath Shearith Hapletah v Assessor of Town of Fallsburg*, 79 NY2d at 250-251 [petitioner's property was primarily used for religious purposes and those portions of the property which were used for housing faculty, staff, students, and their families were tax exempt because they were necessary and reasonably incidental to the primary religious purpose of the property]; *Matter of Ellis Hosp. v Fredette*, 27 AD2d 390, 391 [1967] [parking lot of hospital was entitled to tax exemption because it was constructed to provide parking facilities for employees, patients and visitors and, thus, was reasonably incidental to the hospital's operation]).

Where the use of an otherwise nonexempt portion of such property is not reasonably incidental to the use of the property for its primary, exempted purpose, that portion is taxable and, thus, the property owner receives only a partial tax exemption (*see Independent Church of Realization of Word of God v Board of Assessors of Nassau County*, 81 AD2d 579 [1981] [the plaintiff was entitled only to a partial exemption for those portions of its building used for educational and religious purposes; those portions used to provide health care were not incidental to the

plaintiff's exempt activities]; *University of Rochester v Wagner*, 63 AD2d 341, 348 [1978], *affd* 47 NY2d 833 ["to the extent that nonexempt uses do occur on the premises and where they cannot be said to be merely 'incidental' purposes an allocation or partial exemption is mandated"]; *cf. Matter of St. Francis Hosp. v Taber*, 76 AD3d 635 [2010] [parking garage owned by adjacent not-for-profit hospital, and employed by both the hospital and a for-profit medical group that leased office space from the hospital, is partially tax exempt to the extent that it is employed as a necessary incident of the hospital's operations]).

However, where, as here, the primary use of the property is not for an exempted purpose, the property owner is not entitled to any exemption, even if a small portion of the property is used for an exempted purpose.

For example, in *Matter of Town Hall v Tax Commn. of City of N.Y.* (18 AD2d 629 [1962]), the New York University Club sought a tax exemption for certain of its property on the basis that it was used exclusively for educational purposes. The Appellate Division, First Department (hereinafter the First Department), concluded that New York University failed to make that showing. In reaching its determination, the First Department noted that the use of the property for noneducational and, therefore, nonexempt purposes, did not bar exemption, provided that the noneducational use was merely incidental to the primary educational use. However, "the noneducational use made of these premises was not an incidental one" (*id.* at 630). Rather, the noneducational use "was the dominant one and . . . the use for educational purposes was merely incidental" (*id.*). Therefore, there was to be "no exemption" (*id.*).

The same result was reached in *Matter of Association of Bar of City of N.Y. v Lewisohn* (34 NY2d 143 [1974]). There, the Court of Appeals was presented with the issue of whether the Association of the Bar of the City of New York (hereinafter the NYC Bar) was entitled to a real property tax exemption. The Court of Appeals noted that while many of the NYC Bar's activities on the subject property were educational and, to a lesser extent, charitable, those exempt activities were merely "incidental and peripheral" to the NYC Bar's non-tax-exempt purpose (*id.* at 153). Thus, the Court of Appeals held that the NYC Bar was not entitled to any real property tax exemption, notwithstanding that some of the property at issue was used for an exempt purpose.

In another case also determined in *Matter of Association of Bar of City of N.Y. v Lewisohn* (34 NY2d 143 [1974]), the Court

of Appeals likewise concluded that the Explorers Club was not entitled to a tax exemption on its property. The Court concluded that the Explorers Club was "an organization not conducted for purposes primarily charitable or educational, but for scientific purposes," a purpose no longer exempted (*id.* at 154). "To be sure," the Court noted, the Explorers Club had "charitable and educational attributes and functions," but those aspects were "adjunctive" or "incidental" to the Explorers Club's primary scientific purpose (*id.*).

The Osborn cites to the Court of Appeals decision in *Matter of St. Luke's Hosp. v Boyland* (12 NY2d 135 [1962]) in support of its contention that even though a parcel of real property is not primarily or principally used for an exempt purpose, portions of said property otherwise used for exempt purposes may qualify for a tax exemption under RPTL 420-a. However, the Osborn's reading of *St. Luke's* is incorrect. In that case, the petitioner hospital objected to assessments on its allegedly exempt apartment buildings, which were "occupied partly by personnel, chiefly doctors and nurses, employed by the hospital" (*id.* at 141). It was

> "conceded that all income from these properties is applied to the maintenance and support of the hospital. Some of the tenants in these buildings have no connection with the hospital but as their apartments become vacant they are rented only to employees, a purpose claimed to be reasonably incident to the major purpose of the hospital" (*id.*).

Ultimately, the Court of Appeals held that the apartments were reasonably incidental to the otherwise principal and exempt use of the property as a hospital and, thus, were tax exempt. However, the Court of Appeals also held that the apartments not rented out to hospital personnel were not tax exempt, despite the fact that the rental income was paid to and used by the hospital for hospital use purposes. Thus, that case does not stand for the proposition advanced by the Osborn, that partially exempt uses are eligible for real property tax exemption even if the parcel of property on which they are situated is not principally or primarily used for an exempt purpose. In fact, as the Court of Appeals recently explained, "[I]n *St. Lukes* . . . [t]he test, we said, is whether the apartments are devoted to a use which is reasonably incident to the major purpose of the hospital" (*Matter of Adult Home at Erie Sta., Inc. v Assessor & Bd. of Assessment Review of City of Middletown*, 10 NY3d at 216 [internal quotation marks omitted]).

The Supreme Court here, in reaching its conclusion, relied principally on our decision in *Matter of San Simeon By The Sound v Russell* (250 AD2d 689 [1998]). In *San Simeon,* the only question raised was whether San Simeon's facilities were a hospital, thereby entitling it to a tax exemption under RPTL 420-a. No issue was raised as to whether San Simeon's property was being used principally or primarily as a hospital. Thus, nothing in that decision eliminated the threshold requirement under RPTL 420-a that a property be principally or primarily used as hospital before any portion of it receives a partial tax exemption.

In sum, the Osborn's use of part of its property as a hospital is merely incidental or auxiliary to its main purpose: catering to the needs of healthy and wealthy senior citizens, which is not an exempted use. Put another way, since the property as a whole is not principally engaged in an exempt activity, the small part thereof which is so engaged cannot receive a partial use exemption under the current statutory and case law framework referable to real property tax exemption (*see Matter of Association of Bar of City of N.Y. v Lewisohn,* 34 NY2d at 153-154; *Matter of Town Hall v Tax Commn. of City of N.Y.,* 18 AD2d at 629; *accord Presbyterian Homes of Synod of N. J. v Division of Tax Appeals,* 55 NJ 275, 289, 261 A2d 143, 150 [1970]).

B. <u>Valuation</u>

1. <u>Valuing the Osborn as a Mixed Residential and Commercial Property</u>

■ We begin our analysis by noting that the valuation of assessed property is essentially a question of fact (*see Matter of Consolidated Edison Co. of N.Y., Inc. v City of New York,* 8 NY3d 591, 595 [2007]; *Matter of Saratoga Harness Racing v Williams,* 91 NY2d 639, 646-647 [1998]; *Matter of General Elec. Co. v Town of Salina,* 69 NY2d 730, 732 [1986]; *W.T. Grant Co. v Srogi,* 52 NY2d 496, 510 [1981]). Thus, the courts have considerable discretion in reviewing the relevant evidence as to the specific property before them (*see Matter of Consolidated Edison Co. of N.Y., Inc. v City of New York,* 8 NY3d at 597; *Matter of Mill Riv. Club v Board of Assessors,* 48 AD3d 169, 177 [2007]). Of course, the ultimate purpose of a tax certiorari valuation proceeding is to arrive at a fair and realistic value of the property (*see Matter of Great Atl. & Pac. Tea Co. v Kiernan,* 42 NY2d 236, 242 [1977]). But,

"[t]he command of . . . the Real Property Tax Law

that all property be assessed at full value does not pronounce an inelastic approach to valuation. Nor does the legislative directive specify a particular method for establishing value. And courts, being under no compunction to do so, have not confined assessors to any one course. To ensure that the existence of varied and multifaceted patterns of land use and ownership does not frustrate the design that each contribute equitably to the public fisc, courts have upheld any fair and nondiscriminatory method that appears most likely to achieve that end" (*Matter of Merrick Holding Corp. v Board of Assessors of County of Nassau*, 45 NY2d 538, 541 [1978]).

In this instance, both of the valuation experts who testified used a direct income capitalization approach to value the Osborn's property. However, while agreeing on that approach, the parties' experts differed on the appropriate methodology (*see Matter of Habern Realty Co. v Tax Commn. of City of N.Y.*, 102 AD2d 302, 303-304 [1984]). Rye's expert valued the Osborn as a CCRC, using the actual revenues generated by the Osborn, and including resident fees, interest earned on both entrance fees and the Osborn's endowment fund, and the income generated on space the Osborn rents to third parties. The Osborn's expert, in contrast, valued the Osborn as a mix of residential and commercial property and looked to the rent charged on comparable properties. The Supreme Court weighed this evidence, including the evidence of claimed deficiencies in the assessment, and correctly concluded that the Osborn had demonstrated by a preponderance of the evidence that its property had been overassessed (*see Matter of FMC Corp. [Peroxygen Chems. Div.] v Unmack*, 92 NY2d 179, 188 [1998]; *People ex rel. MacCracken v Miller*, 291 NY 55, 61 [1943]; *Matter of Rainbow Diner v Board of Assessors*, 71 AD3d 901, 902 [2010]).

In making his assessment, Rye's expert inappropriately considered the business enterprise income of the Osborn. Rental income reflects the value of real estate alone, while business income is a measure of the real property, personal property, and the intangible assets of the business (*see* 13 Warren's Weed, New York Real Property § 132.10 [5th ed] ["Incomes Compared"]; Appraisal of Real Estate, at 29 [Appraisal Inst 13th ed]). In a tax certiorari valuation, the income stream subject to capitalization measures the rental value of the property, exclusive of the business conducted on the property (*see* 13 War-

ren's Weed, New York Real Property § 132.10 [5th ed] ["Incomes Compared"]; *see also Matter of Barnum v Srogi*, 54 NY2d 896, 898 [1981]; *Matter of Farone & Son v Srogi*, 96 AD2d 711 [1983]). Thus, the value of the real estate, not the business, is the subject of the real property tax and, hence, the subject of review in a tax certiorari valuation proceeding (*see* 13 Warren's Weed, New York Real Property § 132.10 [5th ed] ["Incomes Compared"]; *see also People ex rel. Hotel Paramount Corp. v Chambers*, 298 NY 372, 374 [1949]; *Matter of Avis Rent A Car Sys. v Town of Rye*, 131 AD2d 568 [1987]; *Matter of White Plains Props. Corp. v Tax Assessor of City of White Plains*, 58 AD2d 653, 654 [1977]).[4] The interest earned on the entrance fees that the Osborn charges some residents, as well as the interest earned on the Osborn's endowment fund, clearly constitute business enterprise income (*see Matter of Farone & Son v Srogi*, 96 AD2d at 711; *People ex rel. Metro. Jockey Club v Mills*, 190 Misc 277, 282-283 [1947], *affd* 273 App Div 971). Such interest comprises a significant portion of the actual revenues that Rye's expert included in his calculation.

The error made by Rye's expert in including interest income in his calculation was exacerbated by his additional inclusion of the monthly fees charged to the Osborn's residents. Rye's expert utilized such monthly fees as if they were "contract rent" and, therefore, demonstrative of "fair market rent" (Warren's Weed, New York Real Property § 132.18 [5th ed] ["Potential Gross Income"]; *see* Appraisal of Real Estate, at 453-454 [Appraisal Inst 13th ed]; *see also Matter of North Country Hous. v Board of Assessment Review for Vil. of Potsdam*, 298 AD2d 667, 668-669 [2002]). However, while the monthly fees charged to residents at the Osborn have a rental component, they also include payment for a wide array of goods and services unrelated to rent.

The Osborn's expert, in contrast, used a methodology generally accepted within the field of real property appraisal, and one that did not include business enterprise income (*see Matter of Saratoga Harness Racing v Williams*, 91 NY2d at 644; Appraisal of Real Estate, at 466, 471-472 [Appraisal Inst 13th ed]). The Osborn's expert appropriately divided the property into residential and commercial components, and then looked at rents

---

**4.** The Appraisal Institute has written that "[i]t may be difficult to separate the market value of the land and the building from the total value of the business, but such a division of realty and non-realty components of value may be required by the intended use of the appraisal" (Appraisal of Real Estate, at 30 [Appraisal Inst 13th ed]).

charged on comparable properties, taking into account the necessary adjustments in determining the market rent of the residential and commercial components of the Osborn (*see Matter of Saratoga Harness Racing v Williams*, 91 NY2d at 644; Appraisal of Real Estate, at 471-472 [Appraisal Inst 13th ed]; *cf. Matter of General Elec. Co. v Town of Salina*, 69 NY2d at 731-732; *Matter of P.G.C. Assoc. v Assessors of Town of Riverhead*, 270 AD2d 272, 273 [2000]). Contrary to Rye's contention, the comparable properties upon which the Osborn's expert relied were sufficiently similar to the residential and commercial components of the Osborn. "A comparable sale [or lease] need only be sufficiently similar to serve as a guide to the market value of the [subject] complex, notwithstanding differences between these comparables and the [subject] property" (*Matter of FMC Corp. [Peroxygen Chems. Div.] v Unmack*, 92 NY2d at 189 [internal quotation marks omitted]; *see Matter of Phelps Dodge Indus. v Kondzielaski*, 131 AD2d 675, 678 [1987] [observing that the degree of comparability is a question of fact to be resolved by the trial court]).

Since there is no merit to Rye's contention regarding the comparability of the properties upon which the Osborn's expert relied for determining "fair market rent," there is also no merit to Rye's contentions regarding the expert's reliance on the expenses, vacancy and collection loss rates, and capitalization rates which were derived from those comparables.

## 2. Construction Costs

Contrary to Rye's contention, the Osborn's expert did consider the phase-two construction and its impact on the Osborn's fair market value for the years 2002 and 2003. As the appraisal report of the Osborn's expert clearly reflects, the livable square footage of the Osborn was increased following the completion of the phase-two construction. Since the Supreme Court accepted the calculation of the potential gross income offered by the Osborn's expert, it necessarily included the increased square footage to the property as a result of the completion of the phase-two construction. Accordingly, Rye's contention in this regard is without merit.

Alternatively, Rye contends that the increase in value which the Osborn's expert did apply to the property following the completion of the phase-two construction was inadequate, as the increase did not comport with the actual cost of construction. Notably, both the expert for Rye and the expert for the Osborn rejected the cost approach (*see G.R.F. v Board of Assessors*

*of County of Nassau*, 41 NY2d 512, 514 [1977] ["The cost approach, which, among other things, ignores entirely factors like functional obsolescence, is useful principally, apart from specialties, to set a ceiling on valuation"]; Appraisal of Real Estate, at 377-393 [Appraisal Inst 13th ed]). Indeed, Rye's expert found the cost approach "unreliable," and stated that, as an income-producing property, the market value of the Osborn's property was best represented by the property's ability to generate income. Thus, Rye's expert only considered actual construction costs as guidance with respect to the quality of the improvements in place, the contribution of the value of real estate itself to the total value of the improved property, and support for his value conclusions. The Osborn's expert testified that he was aware of the actual construction costs and, as reflected in his appraisal report, that actual construction costs were not in line with the construction costs for new apartments in the area. Thus, the Osborn's expert concluded, and we agree, that the actual construction costs were not reflective of the property's value (*see* Appraisal of Real Estate, at 382 [Appraisal Inst 13th ed] ["In any market, the value of a building *can* be related to its cost" (emphasis added)]).

VII. Conclusion

In light of the foregoing, the Supreme Court properly fixed the total assessed value of the subject property in the sums of $2,184,260 for tax year 1997, $2,480,000 for tax year 1998, $2,297,880 for tax year 1999, $2,318,400 for tax year 2000, $2,213,360 for tax year 2001, $2,103,300 for tax year 2002, and $2,133,120 for tax year 2003. Since no tax exemption is warranted, the proper taxable portion of the assessed value of the subject property for each tax year is simply these total assessed values for each corresponding year, rather than the sums of $2,045, 950 for tax year 1997, $2,212,300 for tax year 1998, $2,212,300 for tax year 1999, $2,212,300 for tax year 2000, $2,212,300 for tax year 2001, $2,642,300 for tax year 2002, and $2,642,300 for tax year 2003, as initially determined by Rye. For tax years 1997 through 2001, the proper taxable portion of the assessed value of the subject property is greater than the taxable portion of the assessed value as initially determined by Rye, which arrived at its lesser figures by improperly applying the partial hospital use tax exemption to its determinations of the total assessed values, despite the fact that its total assessed values were inflated. Consequently, the Osborn owes Rye real property tax payments for those tax years. Conversely, for tax

years 2002 and 2003, the taxable portion of the assessed values of the subject property as determined by this Court is less than the taxable portion of the assessed values as initially determined by Rye. Consequently, Rye owes the Osborn a refund for overpayments of real property tax for those tax years. Accordingly, the matter must be remitted to the Supreme Court, Westchester County, to calculate the amount of real property tax owed by the Osborn for tax years 1997 through 2001, and the amount of real property tax to be refunded to the Osborn for tax years 2002 and 2003.

We note that Rye is not aggrieved by so much of the order and judgment as granted a partial hospital use tax exemption to the Osborn's property, as Rye granted that exemption in the first instance, and a party may not challenge its own determination in a proceeding pursuant to RPTL article 7 (*see* CPLR 5511). Accordingly, Rye's appeal from that portion of the order and judgment must be dismissed.

The parties' remaining contentions have either been rendered academic in light of our determination or are without merit.

Accordingly, the appeal by the Assessor of City of Rye, Board of Assessment Review of City of Rye, and the City of Rye from so much of the order and judgment as granted those branches of the petitions which sought a partial hospital use exemption for the subject property pursuant to Real Property Tax Law § 420-a is dismissed, as those parties are not aggrieved by that portion of the order and judgment. The order and judgment is modified on the appeal by Rye City School District, on the law, by deleting the provision thereof granting those branches of the petitions which sought a partial hospital use exemption from real property taxation for the subject property pursuant to Real Property Tax Law § 420-a and substituting therefor a provision denying those branches of the petition, and by deleting the provision thereof directing payment of tax refunds to the petitioner for tax years 1997 through 2001, and, as so modified, the order and judgment is affirmed insofar as appealed and cross-appealed from, and the matter is remitted to the Supreme Court, Westchester County, to calculate the amount of real property tax owed by the petitioner for the tax years 1997 through 2001 and the amount of real property tax to be refunded to the petitioner for tax years 2002 and 2003.

RIVERA, J.P., SANTUCCI and ENG, JJ., concur.

Ordered that the appeal by the Assessor of City of Rye, Board of Assessment Review of City of Rye, and the City of Rye from

so much of the order and judgment as granted those branches of the petitions which sought a partial hospital use exemption for the subject property pursuant to Real Property Tax Law § 420-a is dismissed, without costs or disbursements, as those parties are not aggrieved by that portion of the order and judgment (*see* CPLR 5511); and it is further,

Ordered that the order and judgment is modified on the appeal by Rye City School District, on the law, (1) by deleting the provision thereof granting those branches of the petitions which sought a partial hospital use exemption from real property taxation for the subject property pursuant to Real Property Tax Law § 420-a, and substituting therefor a provision denying those branches of the petition, and (2) by deleting the provision thereof directing payment of tax refunds to the petitioner for tax years 1997 through 2001; as so modified, the order and judgment is affirmed insofar as appealed and cross-appealed from, without costs or disbursements and the matter is remitted to the Supreme Court, Westchester County, to calculate the amount of real property tax owed by the petitioner for the tax years 1997 through 2001 and the amount of real property tax to be refunded to the petitioner for tax years 2002 and 2003.