[847 NYS2d 670]

In the Matter of MILL RIVER CLUB, Appellant, v BOARD OF ASSESSORS et al., Respondents.

Second Department, December 18, 2007

## SUMMARY

### APPEARANCES OF COUNSEL

*Jaspan Schlesinger Hoffman LLP*, Garden City (*Jon N. Santemma, Stanley Harwood, Andrew G. Cangemi, Arthur K. Feldman, Jay M. Herman, Michael R. Martone* and *Ronald C. Santopadre* of counsel), for appellant.

*Lorna B. Goodman, County Attorney*, Mineola (*Dennis J. Saffran* and *Berkman, Henock, Peterson & Peddy* [*Robert T. Bloom*] of counsel), for respondents.

### OPINION OF THE COURT

FISHER, J.

This appeal involves consolidated tax certiorari proceedings challenging the assessments, for the tax years 1997/1998 through 2005/2006, of four adjacent parcels of land located in Upper Brookville, owned and operated by the petitioner as a private, not-for-profit golf course and country club. Among the questions presented is whether the Supreme Court erred in refusing to use a "tax-loaded" capitalization rate when it employed the capitalization of income method to determine the value of the subject property.

The petitioner, Mill River Club, owns and operates a private, not-for-profit country club golf course located in Upper Brookville, Nassau County. The subject property consists of four contiguous parcels, identified as section 24, block E, lots 8A, 8D, 189, and 191 on the Nassau County Land and Tax Map, forming an irregular shape and covering a total area of approximately 123 acres. Apart from its 18-hole, regulation length golf course, the property includes, among other things, a 42,000 plus square foot clubhouse with food and beverage facilities and a pro shop. The petitioner also derives revenue from the operation of a full-length driving range on five additional acres of land leased from the State of New York at an annual flat rent of $24,000.

For the tax years 1997/1998 through 2005/2006, the County's assessment produced equalized market values of the subject property as set forth in the following table:

| TAX YEAR | EQUALIZED MARKET VALUE |
|---|---|
| 1997/1998 | $ 5,548,777 |
| 1998/1999 | $ 5,618,125 |
| 1999/2000 | $ 5,921,607 |
| 2000/2001 | $ 6,589,130 |
| 2001/2002 | $ 7,103,906 |
| 2002/2003 | $ 7,577,500 |
| 2003/2004 | $11,774,973 |
| 2004/2005 | $11,774,973 |
| 2005/2006 | $10,070,050 |

The petitioner commenced these tax certiorari proceedings challenging its real property tax assessments for each of those years. At a nonjury trial, the parties produced the testimony and reports of their respective expert appraisers. Both appraisers valued the property based on its existing use (*see Matter of Addis Co. v Srogi*, 79 AD2d 856, 857 [1980]), using the income capitalization method, which is widely recognized as a valid method to determine the market value of income-producing property (*see Matter of Saratoga Harness Racing v Williams*, 91 NY2d 639, 644 [1998]; *Matter of Merrick Holding Corp. v Board of Assessors of County of Nassau*, 45 NY2d 538, 542 [1978]). The capitalization of income method rests on the proposition that the value of income-producing property is the amount a willing buyer, desiring but not compelled to purchase it as an investment, would be prepared to pay for it under ordinary conditions to a seller who desires, but is not compelled, to sell (*see W.T. Grant Co. v Srogi*, 52 NY2d 496, 510 [1981]; *Matter of Alexander's Dept. Store of Val. Stream v Board of Assessors*, 227 AD2d 549). That amount will depend on the net income the property will likely produce inasmuch as the purchase price represents "the present worth of anticipated future benefits" (Arthur E. Gimmy and Buddie A. Johnson, Analysis and Valuation of Golf Courses and Country Clubs, at 117 [Appraisal Institute 2003]). The factor by which a property's likely net income is related to its value at any particular time is the capitalization rate, which is usually derived from a study of the sales of comparable, income-producing properties, using market

data including, where available, investor surveys (*id.* at 119). Value is arrived at under the capitalization of income method by dividing the net income by the capitalization rate.

Because most golf courses are run by specialized companies under operating leases, the net income a course's owner is likely to derive corresponds to the rent a tenant-operator will be willing to pay, and that rent, in turn, depends on the revenue the golf course is likely to produce. The experts here agreed that the revenue the subject property could generate should be calculated by assuming that the property would be operated, not as a private, not-for-profit country club, but as a public or semi-private, for-profit golf course (*id.* at 119 [future income potential of a nonprofit golf course "may still be measured with a profit-oriented analysis to produce an accurate and appropriate value indication"]). Once that revenue was estimated, it would be converted into a hypothetical "market rent," which is the rent that a property generating such revenue would likely command on the open market. The present value of that "market rent," and therefore of the property, would then be calculated using an appropriate capitalization rate (*see Matter of Eckerd Corp. v Semon*, 35 AD3d 931, 934 [2006]).

At the trial, each expert offered an estimate of the revenue that would have been generated by the property had it been operated as a public or semi-private, for-profit golf course during the relevant tax periods, taking into account, inter alia, the property's characteristics, prevailing local, regional and national market conditions, and the income generated by comparable golf courses over the same periods. Next, each expert converted the estimated revenue into a "market rent," and then netted the "market rent" for each year by deducting administrative expenses. Each expert then divided the result he reached by the capitalization rate he thought appropriate to yield the estimated market value of the property for each of the relevant tax years.

The two experts differed widely as to the appropriate market rents and capitalization rates. Of particular significance, the petitioner's expert assumed a market rent derived from a gross lease under which the property's owner remains responsible for the payment of real estate taxes, while the County's expert assumed a market rent derived from a triple net lease under which the tenant pays, inter alia, all real estate taxes. Consistent with his assumption, the petitioner's expert accounted for the owner's real estate tax burden by adding a tax factor to the capitalization rate based on the effective tax rate for each of the relevant years (*see Matter of Senpike Mall Co. v Assessor of*

Town of New Hartford, 136 AD2d 19 [1988]). Conversely, the County's expert, consistent with his triple net lease market rent assumption, made no adjustment in the capitalization rate for real estate taxes.

The Supreme Court adopted the County's triple net lease approach, but changed a number of variables affecting the calculation of the relevant market rents. The court also adopted its own capitalization rates, which fell somewhere between the parties' proposed rates and did not include a tax factor. In the end, the market values found by the court were between 12 and 19% lower than those proposed by the County, and between 55 and 77% higher than those proposed by the petitioner. Based on its findings, the court determined that the petitioner had been underassessed with respect to the tax years 1997/1998 through 2002/2003, and therefore dismissed the petitions pertaining to those tax years. The court granted the petitions with respect to the tax years 2003/2004 through 2005/2006, but directed only modest reductions in the assessed value. The petitioner appeals.

Notably, the petitioner either expressly adopts, or does not dispute, a number of factual findings made by the Supreme Court. Specifically, in estimating revenue from various sources, the court first determined the number of rounds of golf that would have been played on the subject property during the relevant tax years had it been operated with a view toward maximizing profits. The court then separately calculated the estimated revenue per round from all sources such as green fees, the driving range, the pro shop, food and beverage sales, and "other" revenues. The court's findings as to the estimated revenue per round of golf from each source for each of the tax years in question may be summarized as follows:

| Year/Income | Golf | Range | Other | Shop | Food & Beverage |
|---|---|---|---|---|---|
| 1997 | $70.00 | $3.30 | $0.50 | $6.50 | $37.50 |
| 1998 | $72.50 | $3.40 | $0.52 | $6.75 | $38.75 |
| 1999 | $75.00 | $3.50 | $0.54 | $7.00 | $40.00 |
| 2000 | $77.50 | $3.60 | $0.56 | $7.25 | $41.25 |
| 2001 | $79.50 | $3.70 | $0.57 | $7.50 | $42.25 |
| 2002 | $81.00 | $3.80 | $0.58 | $7.60 | $43.25 |
| 2003 | $82.00 | $3.90 | $0.59 | $7.75 | $44.00 |
| 2004 | $84.00 | $4.00 | $0.60 | $8.00 | $45.00 |

And the court's findings as to the number of rounds of golf that would have been played on the course during the tax years in question had the property been operated as a public or semi-private, for-profit golf course are as follows:

| Year | Number of Rounds of Golf Played |
|------|--------------------------------|
| 1997 | 40,000 |
| 1998 | 40,000 |
| 1999 | 40,000 |
| 2000 | 40,000 |
| 2001 | 38,000 |
| 2002 | 38,000 |
| 2003 | 36,000 |
| 2004 | 36,000 |

Thus, for each taxable year, by multiplying the estimated revenue per round for each source by the estimated number of rounds, the court calculated the revenue that would have been generated that year from that source had the property been operated as a public or semi-private, for-profit golf course.

In order to translate the total revenue for a specific tax year into a market rent for that year, each expert proposed that the market rent be calculated based upon a percentage of the revenue derived from each source. To arrive at an appropriate rent percentage, each expert considered a number of comparable properties for which actual revenues and rental payments were either known or ascertainable. Although the experts differed substantially as to the number of rounds that would have been played in each of the tax years, the petitioner does not challenge the court's factual findings on this issue. The experts did not substantially differ as to the revenue per round from each of the cited sources. Nor did they differ significantly on the appropriate conversion of most categories of revenues to market rents. For example, the market rent proposed by the petitioner's expert consisted, inter alia, of 25% of the "range" and "other" revenues, 10% of the "shop" revenue, and 7% of the "food and beverage" revenue. The market rent proposed by the County's expert consisted, inter alia, of 20% of the "range" and "other" revenues, 7% of the "shop" revenue, and 8% of the "food and beverage" revenue. Thus, the rent percentages proposed by the experts for these sources were similar, and the court's adoption of the County's rent percentages with respect to "range" (20%),

"other" (20%), "shop" (7%) and "food and beverage" (8%) is not challenged on appeal.

The experts diverged significantly, however, with respect to the proper rent percentage to be applied to golf, the greatest source of revenue. The County's expert proposed a market rent percentage of 30%, whereas the petitioner's expert proposed 25%. The significance of this difference is not insubstantial with respect to the final estimated value of the property. For example, on golf revenue of $2,800,000, the petitioner's 25% rate would yield a market rent component of $700,000, whereas the County's 30% rate would yield $840,000. Assuming a 10% capitalization rate, the ultimate difference in the estimated values of the property would be $1,400,000.

Each expert derived his rent percentage for golf fees from his own review of comparable golf courses for which revenues and lease terms were either known or ascertainable. Most of these comparables, however, were golf courses operated on tax-exempt municipal or state land—a fact that appears to be at the root of the experts' conflicting views. In their respective analyses of tax-exempt properties as comparables, the experts differed on whether the rents paid by tenants on tax-exempt municipal and state properties should be considered net or gross. The petitioner's expert reasoned that, because no real estate taxes were paid by the tenants, the leases must be viewed as gross leases. Conversely, the County's expert reasoned that, because no real estate taxes were paid by the owners, the leases should be viewed as triple net leases. These conflicting assumptions are at the heart of the dispute before us.

Assuming that the vast majority of comparables were operating under triple net leases, the County's expert proposed that the corresponding market rent for the subject property should likewise be calculated as if the tenant were operating the property under a triple net lease. By the same token, the contrary assumption led the petitioner's expert to propose that the market rent should be calculated as if the tenant were operating the property under a gross lease—which, in turn, provided a basis for the petitioner's expert to add a tax factor to the proposed capitalization rate, further reducing the estimated value of the property.

The difficulty, of course, is that the lease of a tax-exempt property does not fit neatly into either a triple net lease or gross lease category because, where the leased property is tax-exempt, neither the tenant nor the owner pays real estate taxes.

Additionally, as the County itself conceded, tax-exempt municipal and state golf courses are not operated with a view toward maximizing profits; rather, they are generally designed to provide affordable play, with fee structures set by the municipality or the State to advance that goal. As a result, tenants of tax-exempt courses generally receive lower golf revenues in exchange for the tax exemption. In fact, the County's expert opined that, if the operator of a municipal course were required to pay real estate taxes, it should be able to raise the green fees in order to cover the tax.

We cannot conclude that the Supreme Court erred in adopting the County's triple net lease assumption for tax-exempt comparables inasmuch as the rental income actually received by a municipality from a tax-exempt golf course, expressed as a percentage of actual revenue, can certainly be viewed as being "net" of any real estate taxes. And the court reasonably took account of the somewhat reduced golf revenues generated at municipal courses by rejecting the market rent percentage of 30% for golf fees proposed by the County in favor of a reduced percentage of 27%, "considering all issues, including a tax component." Contrary to the petitioner's contention, we find that this was not error. In translating information from regulated, tax-exempt municipal comparables to the unregulated and fully taxable subject property, it was not unreasonable for the Supreme Court, based on the testimony of the County's expert, to assume that golf revenue for the subject property would be comparatively higher, and—consistent with the court's triple net lease assumption—would account for a correspondingly lower percentage of market rent paid to the owner.

Additionally, inasmuch as the Supreme Court's determination to treat the estimated market rent as triple net rather than gross is supported by competent evidence, it follows that the court did not err in declining the petitioner's proposal to add a tax factor to the capitalization rate (*see Matter of Senpike Mall Co. v Assessor of Town of New Hartford*, 136 AD2d 19 [1988]). And we discern no other basis to disturb the Supreme Court's factual findings with respect to the capitalization rates used in determining the estimated market values of the subject property for each of the relevant tax years (*see Matter of Town of Islip v Mustamed Assoc.*, 222 AD2d 682, 683 [1995]; *Matter of John P. Burke Apts. v Swan*, 137 AD2d 321, 325-326 [1988]).

"[A]ny fair and nondiscriminating method" that will achieve the tax assessment goal of arriving at a fair market value result

is "acceptable" (*Matter of Gordon v Town of Esopus*, 31 AD3d 981, 982 [2006]; *see also Matter of Saratoga Harness Racing v Williams*, 91 NY2d 639, 643 [1998]). Ultimately, "valuation remains largely a question of fact, and the courts have considerable discretion in reviewing the relevant evidence as to the specific property before them" (*Matter of Consolidated Edison Co. of N.Y., Inc. v City of New York*, 8 NY3d 591, 597 [2007]). We find neither legal error nor an improvident exercise of discretion in the way the Supreme Court reviewed the evidence and reached its conclusion.

The petitioner's remaining contentions are without merit.

Accordingly, the order and judgment is affirmed insofar as appealed from.

SCHMIDT, J.P., GOLDSTEIN and LIFSON, JJ., concur.

Ordered that the order and judgment is affirmed insofar as appealed from, with costs.