OPINION OF THE COURT
Dickerson, J.

Introduction

The petitioner, Hempstead Country Club (hereinafter the County Club), owns approximately 123 acres of property in Nassau County on which it operates a private, not-for-profit golf course. The Country Club commenced these consolidated tax certiorari proceedings to challenge the tax assessments imposed on its property by the appellants, the Board of Assessors, the Board of Assessment Review, and the Assessment Review Commission of the County of Nassau, for the tax years 2006/2007, 2007/2008, and 2008/2009.
*125 The Country Club and the appellants agree that, for the purposes of the assessments, the property should be assessed as a private, for-profit golf course. The parties also agree that the income capitalization method of valuation is the proper approach for the purposes of these assessments. Although the parties’ respective appraisers agree that the amount of real estate taxes imposed on the property should be taken into account when computing the property’s fair market value, they differ on how to do so. The Country Club’s appraiser, in effect, converted the leases for his comparable properties into gross leases, under which the owner, rather than the lessee, is obligated to pay the real estate taxes, and utilized the “assessor’s formula,” pursuant to which a factor is added to the capitalization rate to account for real estate taxes. The appellants’ appraiser adopted an approach assuming a triple net lease, under which the lessee, not the owner, is obligated to pay real estate taxes. Therefore, according to the appellants, the expense of real estate taxes is accounted for in the fair market rent for the property, and need not be accounted for in the capitalization rate. Additionally, the appellants’ appraiser downwardly adjusted his rent-to-revenue ratio, used in determining the fair market rent for the property, to account for high real estate taxes in the subject location. The Supreme Court adopted the approach proposed by the Country Club, which resulted in a reduction of the original assessed value.
The principal issue we must decide on this appeal is whether the approach advocated by the Country Club’s appraiser, and adopted by the Supreme Court, was “fair and nondiscriminating,” was “acceptable,” and resulted in a fair market value assessment of the subject property, or if, as the appellants assert, it resulted in improper “double counting.” We must make this determination against a background which includes the fact that, in a case decided in 2007, Matter of Mill Riv. Club v Board of Assessors (48 AD3d 169 [2007]), a tax certiorari proceeding challenging the assessment of parcels on which a private, not-for-profit golf course was operated, this Court approved of the triple net lease approach advocated by the taxing authority in that case and by the appellants here.
Factual and Procedural Background
The real property at issue in these tax certiorari proceedings consists of approximately 123 acres in Nassau County. The property is owned by the Country Club, which operates a private, not-for-profit country club on the property. The property is improved by, among other things, an 18-hole golf course.
*126 Pursuant to article 7 of the Real Property Tax Law, the Country Club commenced tax certiorari proceedings to challenge the assessed values of its real property for the tax years 2006/2007, 2007/2008, and 2008/2009. The Supreme Court consolidated these proceedings and conducted a nonjury trial beginning on December 1, 2009.
The Country Club’s Appraisal
Jeffrey Dugas, a commercial real estate appraiser, consultant, and broker, testified on behalf of the Country Club, and his appraisal was admitted into evidence.
In appraising the value of the property, Dugas utilized the income capitalization approach, explaining in his appraisal that this was “the most pertinent valuation method for . . . golf course facilities” because “golf courses are [typically] bought based on their income-generating ability.” According to Dugas’s appraisal, the most likely purchaser of the subject property would be an investor. Therefore, the valuation in Dugas’s appraisal attempted to replicate the analysis a prospective purchaser would most likely employ. In order to determine the market value of the property under the income capitalization method, Dugas estimated a fair market rent for the property, and then capitalized “the income attributed to the real estate at a real estate capitalization rate.” In arriving at the fair market rent for the properly alone, Dugas emphasized the need to “first isolate the contributory value of the business and personal property.”
Dugas explained that “rent is a function of the income-generating potential of the property,” and was often computed as a percentage of gross sales. Thus, as a first step in estimating the fair market rent the property could command, Dugas began by analyzing the gross sales revenue for the property, including income generated by greens fees, cart rentals, pro shop sales, and food and beverage sales. Although the Country Club provided Dugas with audited financial statements itemizing annual income, Dugas did not rely on these figures for purposes of his valuation because, as a not-for-profit club, the Country Club’s members maintained the club without regard for profit.
Dugas hypothesized, for purposes of his valuation, that the Country Club was a for-profit facility, and relied on, among other things, comparison with available relevant market data, analyzing a number of comparable golf courses in the New York metropolitan area with weather patterns and demographics similar to those of the Country Club. Based on figures from the *127 comparable properties, and relying on the hypothetical premise that the County Club was operated on a for-profit basis, Dugas calculated the projected revenue for the Country Club for each relevant year. As a component of his calculations, Dugas “trend[ed] downward” by 1.5% annually for prior tax years. He then arrived at estimated revenue figures of $5,864,107 for the 2006/2007 tax year, $5,954,624 for the 2007/2008 tax year, and $6,046,250 for the 2008/2009 tax year.
Having estimated the revenue of the subject property, Dugas proceeded to estimate the fair market rent based on eight comparable golf course rental properties. Dugas explained that “golf courses are typically rented [at a rental price that is] a percentage of revenue.” As such, the next logical step in the valuation process was to find comparable rents in order to estimate how much of the projected revenue the Country Club could expect to pay in rent. In short, Dugas sought to determine the percentage of revenue typically paid in rent by similar clubs, providing him with a rent-to-revenue ratio which he could then apply to the Country Club and its projected revenue.
To compare rent at the various comparable properties and at the Country Club, it was necessary to consider properties with different types of leases. Each of the lease agreements for the eight comparable properties in the northeastern United States analyzed by Dugas fell into one of four categories: (1) gross lease, (2) triple net lease, (3) municipal lease, and (4) hybrid lease.
Dugas explained that a key difference between a gross lease and a triple net lease is the manner in which the responsibility to pay real estate taxes is allocated. Under a gross lease, the landlord or owner is responsible for paying the real estate taxes on the property. Under a triple net lease, the tenant assumes the responsibility of paying the real estate taxes. All other things being equal, the rental payment under a triple net lease would be lower than the rental payment under a gross lease, since the tenant under a triple net lease assumes the additional financial burden of paying the real estate taxes on the property. As Dugas explained, “[i]f an operator knows he can lease the same golf course and not pay taxes compared to the same golf course that has to pay taxes, he can pay more rent [for] the one with no taxes, so the taxes [are] critical as an operating expense.”
Under a municipal lease, the property is owned by the municipality. Therefore, neither the tenant nor the municipal owner is responsible for paying taxes on the tax-exempt property.
*128 In his appraisal, Dugas determined that
“[sjince the determination of an appropriate real estate tax burden is the ultimate objective in this valuation, the most mathematically accurate approach to value begins with an analysis of fair market rent to include the operator’s occupancy costs associated with real estate taxes. Or in other words, the equivalent additional amount of rent that a Lessee would be willing to pay if not responsible for payment of taxes.”
Accordingly, when Dugas considered comparable properties to determine the percentage of revenue that was typically charged as rent (the rent-to-revenue ratio), he used gross lease figures. Where the comparable property was rented under a triple net lease, he added the additional amount a lessee would be willing to pay in rent in light of the fact that the lessee did not have to pay taxes. Dugas considered all of the municipal leases to be gross leases, since, as with a gross lease, the tenants at these comparable properties had no obligation to pay taxes. Thus, Du-gas, in effect, compared the rental costs of the various comparable properties “as if they were gross rents.”
The only comparable property actually held under a triple net lease was a property located in New Jersey, where the lessee paid approximately 3% of gross revenue in taxes. To compensate for this difference, Dugas added 3% to the rent-to-revenue ratio for that property, thereby effectively converting the lease into a gross lease. With regard to the one “hybrid” lease Dugas reviewed, the tenant made payments of $14,000 to the landlord in lieu of taxes. Dugas adjusted the rent-to-revenue ratio for this lease by 0.7%, since $14,000 constituted 0.7% of revenue. Since Dugas deemed the municipal leases to be the equivalent of gross leases, he made no adjustments to those leases.
Taking into account the various adjustments he made to the value of comparable properties, the rent-to-revenue ratios for the golf courses alone across the four properties where golf course rents could be separated from overall rents ranged from 16.5% to 26.7%. Of the six properties where overall rents, as opposed to golf rents, were used, the rent-to-revenue ratios ranged from 11.4% to 23.8%. Dugas referred to these figures as the “grossed up” number, meaning that the triple net lease, the hybrid lease, and the municipal leases had been effectively converted into gross leases. Dugas made additional adjustments to the “grossed up” values to account for “capital obligations” *129 and various other economic factors. After factoring in these adjustments, the rent-to-revenue ratios for the four properties with “golf only” rents ranged from 18.2% to 26.7%. The rent-to-revenue ratios for the six properties with “overall” rents ranged from 13.3% to 16.7%.
Dugas determined that the golf course at the Country Club would be at the high end of the spectrum, and fixed the rent-to-revenue ratio for the golf course at 25%. Then, he chose rent-to-revenue ratios of 10% for the pro shop, 8% for food and beverage, and 10% for “other.” Applying these percentages to the revenue streams for each of these components, and then totaling the values, Dugas computed a rental value of $933,364 for the tax year 2006/2007, $947,637 for the tax year 2007/2008, and $962,063 for the tax year 2008/2009. Using the valuation numbers for the 2008/2009 tax year, he divided the estimated rental value ($962,063) by the total revenue for that year ($6,046,250) for an overall rent-to-revenue ratio of approximately 16%. As this percentage was within the range of overall rent-to-revenue ratios for the comparable properties, Dugas concluded that his ratio choice of 25% for golf, as well as the final computation for overall rent-to-revenue ratio, had been validated. He then deducted 2% from the rental value of each year for “general and administration fee[s],” yielding rental values of $914,696 for the tax year 2006/2007, $928,685 for the tax year 2007/2008, and $942,821 for the tax year 2008/2009.
Using these rental values, Dugas proceeded to the next step of computing the fair market value of the subject property by dividing the rental value, or net operating income, by the overall capitalization rate. In determining the overall capitalization rate, Dugas first computed the base capitalization rate using the “Band of Investment” technique, which “recognizes the required rate of return for both debt and equity positions as well as their proportionate relation to value.” Relying on, inter alia, a variety of published data, Dugas arrived at a capitalization rate of 11%.
Dugas then described the manner in which he accounted for the impact of real estate taxes by adding a “load factor” to the capitalization rate:
“Once an appropriate occupancy cost (rental amount) is determined, the impact of real estate taxes can be removed from the equation. This is accomplished by adding a factor to the capitalization *130 rate that represents taxes as a percentage of value called an equalized tax rate (equalization rate times the tax rate, or ‘the assessor’s formula’). In this industry this is referred to as a load factor, since it is being added to the capitalization rate. By utilizing this methodology, the analysis avoids a circular situation in which market value and real estate taxes are co-dependent variables.”
Dugas subsequently explained,
“Because the burden of real estate taxes is considered a cost of occupancy, its impact directly affects a property’s market value, making it critical that we account for the different tax rates and liability in our analysis. If two identical properties were available for rent, the one with higher taxes would rent for less, because the operator would have to pay the taxes. In order to eliminate the influence of real estate taxes on the subject, we calculated a tax loaded capitalization rate by adding a tax load factor, based on the assessment to value ratio, or equalization rate, and the overall tax rate as of the date of valuation.”
Dugas used a tax load factor of 7.08% for the tax year 2006/ 2007, 6.85% for the tax year 2007/2008, and 6.37% for the tax year 2008/2009. Dugas explained that these tax load factors represented the fact that the effective tax rate in the Town of Hempstead was approximately 6.5%.
In the final steps of his calculations, Dugas added the base capitalization rate to the load factor for each tax year, resulting in an overall capitalization rate. The overall capitalization rates were 18.08% for the tax year 2006/2007, 17.85% for the tax year 2007/2008, and 17.37% for the tax year 2008/2009. Then Dugas divided the rental value for each tax year by the overall capitalization rate for each year, and then rounded resulting figures out to yield appraised values of $5,100,000 for the tax year 2006/2007, $5,200,000 for the tax year 2007/2008, and $5,400,000 for the tax year 2008/2009.
When questioned by the Supreme Court concerning the approach taken in Matter of Mill Riv. Club v Board of Assessors (48 AD3d 169 [2007]), discussed extensively below, Dugas testified that “[w]hen we do tax certiorari, we’ll do the gross analysis, and the problem with a [triple] net analysis is it’s a circular equation. What you’re solving for is taxes, and that’s what we *131 don’t know, what the taxes are. That’s what we’re challenging is the taxes.” For example, Dugas stated that, if he were to take “their current taxes now and adjusted the comparables down, I would be understating the value because [I would be] using taxes which are too high. You don’t know what the taxes should be.” Dugas asserted that, “by doing it on a gross basis . . . [t]here’s no circular equation and it’s mathematically more correct.”
The Appellants’ Appraisal
Stephen R. Hughes, a real estate appraiser and broker specializing in golf courses, testified on behalf of the appellants, and his appraisal was admitted into evidence.
The Hughes appraisal, like the Dugas appraisal, valued the property under the “hypothetical condition that the subject property operates as a golf course on a for-profit basis,” and performed an income capitalization analysis.
However, according to the Hughes appraisal, the preferred valuation method assumes a triple net lease. Because the burden of real estate taxes is already accounted for in the decreased rental value under a triple net lease, Hughes did not add a tax load factor to the capitalization rate when computing value pursuant to his income capitalization analysis.
Based on his calculations, Hughes estimated the Country Club’s total revenue as $6,150,000 for the tax year 2006/2007, $6,258,750 for the tax year 2007/2008, and $6,367,669 for the tax year 2008/2009. He then analyzed the data from golf course leases in the surrounding area to determine the percentage of revenue typically paid in rent. Hughes concluded that the appropriate rent-to-revenue ratio for the golf course was 22.5%, lower than the 25% ratio calculated by Dugas. Although Hughes acknowledged that “golf percentage rents are typically higher than that, 20 to 30[%],” he emphasized that real estate taxes were high in Hempstead, and explained that to account for the high taxes, he “lower[ed] [the] percentage rent from what would have been the 25 to 30 or so down to 22-and-a-half [%].” Hughes further concluded that the rent-to-revenue ratio for all other revenue, including food and beverage and pro shop sales, was 7.5%. Hughes then arrived at an overall rent-to-revenue ratio of 15.3%.
Like Dugas, Hughes used many municipal leases as comparables when estimating the rent-to-revenue ratio for the subject property. However, Hughes treated these leases as triple net *132 leases, not gross leases. According to Hughes, that was “the crux of the difference in valuation.” Hughes clarified,
“[t]he difference is because [Dugas] adjusted — he adjusted the percentage rent way down in this scenario because of taxes, and it’s my contention that that is completely unnecessary. We look at a net lease. The reason we’re doing a net lease in the first place is so we don’t have to fuss around with the taxes. That’s the confusing part of a tax cert appraisal. If we just focus on revenue, do not consider expenses, then it’s, in my view, a much more straightforward analysis the way I’ve done it.”
Ultimately, Hughes determined in his appraisal that the combined market rent for the subject property was $939,375 for the tax year 2006/2007, $955,969 for the tax year 2007/2008, and $972,575 for the tax year 2008/2009, assuming a triple net lease. After deducting 1.5% for administrative expenses, the market rents under Hughes’s appraisal were $925,284 for the tax year 2006/2007, $941,629 for the tax year 2007/2008, and $957,987 for the tax year 2008/2009.
Hughes then converted income to market value by dividing net operating income by the capitalization rate, as Dugas did in his appraisal. Hughes considered sales of golf courses with stable net incomes, as well as data in various publications, in arriving at his capitalization rate. Based on these considerations, Hughes settled on a capitalization rate of 9.5%, lower than the 11% rate arrived at by Dugas. Employing this rate, Hughes determined that the rounded values for the property were $9,700,000 for the tax year 2006/2007, $9,900,00 for the tax year 2007/2008, and $10,100,000 for the tax year 2008/2009.
Again, unlike Dugas, Hughes did not use a tax load factor in his capitalization rate. Hughes explained that he treated taxes as any other expense, and, thus, taxes were taken into account in the process of settling on a rent-to-revenue ratio. Essentially, Hughes accounted for the cost of real estate taxes by using the triple net lease approach, where income incorporates the expense of taxes, thereby eliminating the need to adjust the capitalization rate.
Decision After Trial
In a decision after trial dated July 15, 2010, the Supreme Court weighed the differing appraisals (2010 NY Slip Op 31831[U] [2010]). In determining which appraiser best ap *133 proximated the income that the property would generate as a public facility, the court adopted Dugas’s figures, finding that the total income was $6,046,250 for the tax year 2008/2009, $5,954,624 for the tax year 2007/2008, and $5,864,107 for the tax year 2006/2007.
The Supreme Court then proceeded to determine the rent-to-revenue ratio. The court observed that it was necessary to first determine whether it would account for the effect of real estate taxes on value by using the triple net lease approach, with an adjustment to the rent-to-revenue ratio to account for the specific tax situation in Hempstead, as suggested by Hughes, or the “assessor’s formula” which applies a unique tax load factor to the capitalization rate, as suggested by Dugas.
The Supreme Court noted that this Court previously accepted the triple net lease approach, with the corresponding adjustment to the rent-to-revenue ratio, in Matter of Mill Riv. Club v Board of Assessors (48 AD3d 169 [2007]). The Supreme Court also noted that, subsequent to Mill Riv. Club, this Court approved the use of the assessor’s formula in Matter of VGR Assoc., LLC v Assessor, Bd. of Assessment Review of Town of New Windsor (51 AD3d 678 [2008]). Reading these two cases together, the Supreme Court concluded that “the issue of whether to use a tax factor or a subjective net approach is in the court’s discretion” (2010 NY Slip Op 31831[U], *9).
The Supreme Court found that, in these proceedings, “the better practice is to add the actual tax contribution to the comparable leases and to capitalize the ‘grossed up’ rent by applying a capitalization rate which includes a tax factor” (id. at *12). Thus, the court adopted Dugas’s approach and rejected Hughes’s approach. The court accepted the assessor’s formula
“as the proper approach for valuing each golf course. It produces a mathematically accurate finding, but even more importantly, avoids the necessity of finding an ‘average’ or ‘typical’ tax burden for all of the courses in the jurisdiction to determine whether or not any particular course is over burdened or under valued.” (Id. at *14.)
The Supreme Court selected a base capitalization rate of 9.5% for the tax year 2006/2007, 9.5% for the tax year 2007/2008, and 10% for the tax year 2008/2009. These rates differed from Dug-as’s suggestion of 11%, as well as from Hughes’s suggestion of 9.5% for all years.
*134 The Supreme Court then used the tax load factors suggested by Dugas to reach the following results for market value: January 2, 2005
$914,696 + [9.5% + 7.08%] = $5,516,863 January 2, 2006
$928,685 + [9.5% + 6.85%] = $5,680,030 January 2, 2007
$942,821 + [10% + 6.37%] = $5,759,444
Finally, the Supreme Court applied the stipulated assessed value ratios to compute taxes of $51,583 for the tax year 2006/2007, $54,528 for the tax year 2007/2008, and $55,579 for the tax year 2008/2009.
The Order and Judgment Appealed From The order and judgment appealed from, entered August 11, 2010, inter alia, granted the petitions to the extent of awarding a reduction in the tax assessments for the tax years 2006/2007, 2007/2008, and 2008/2009, and directed that the assessment rolls be corrected and any tax overpayments be refunded, with interest.
Analysis
Valuation of Real Property Only
As the Supreme Court observed, the parties in these proceedings properly sought to value the subject real property only, independent of the business conducted on the real property. “In a tax certiorari valuation, the income stream subject to capitalization measures the rental value of the property, exclusive of the business conducted on the property” (Matter of Miriam Osborn Mem. Home Assn. v Assessor of City of Rye, 80 AD3d 118, 142 [2010]; see 13 Warren’s Weed, New York Real Property § 132.10 [5th ed]; see also Matter of Barnum v Srogi, 54 NY2d 896, 898 [1981]; Matter of Farone & Son v Srogi, 96 AD2d 711, 711 [1983]). “Thus, the value of the real estate, not the business, is the subject of the real property tax and, hence, the subject of review in a tax certiorari valuation proceeding” (Matter of Miriam Osborn Mem. Home Assn. v Assessor of City of Rye, 80 AD3d at 143; see 13 Warren’s Weed, New York Real Property § 132.10 [5th ed]; see also People ex rel. Hotel Paramount Corp. v Chambers, 298 NY 372, 374 [1949]; Matter of Avis Rent A Car Sys. v Town of Rye, 131 AD2d 568, 568 [1987]; Matter of White Plains Props. Corp. v Tax Assessor of City of White Plains, 58 AD2d 653, 654 [1977]).
*135 Appraisal Methods Generally
“In assessment review proceedings, the value at which real property may be taxed has been equated with market value” (W.T. Grant Co. v Srogi, 52 NY2d 496, 510 [1981], superseded in part by RPTL 720 [1] [b]). “The ‘market value of real property is the amount which one desiring but not compelled to purchase will pay under ordinary conditions to a seller who desires but is not compelled to sell’ ” (W.T. Grant Co. v Srogi, 52 NY2d at 510, quoting Heiman v Bishop, 272 NY 83, 86 [1936]).
“ ‘[A]ny fair and nondiscriminating method’ that will achieve the tax assessment goal of arriving at a fair market value result is ‘acceptable’ ” (Matter of Mill Riv. Club v Board of Assessors, 48 AD3d at 176-177, quoting Matter of Gordon v Town of Esopus, 31 AD3d 981, 982 [2006]; see Matter of Saratoga Harness Racing v Williams, 91 NY2d 639, 643 [1998]). “Ultimately, ‘valuation remains largely a question of fact, and the courts have considerable discretion in reviewing the relevant evidence as to the specific property before them’ ” (Matter of Mill Riv. Club v Board of Assessors, 48 AD3d at 177, quoting Matter of Consolidated Edison Co. of N.Y., Inc. v City of New York, 8 NY3d 591, 597 [2007]).
The Court of Appeals has emphasized the need for flexibility in determining the valuation method most likely to achieve the goal of equitably distributing the tax burden among property owners, stating,
“The command of . . . the Real Property Tax Law that all property be assessed at full value does not pronounce an inelastic approach to valuation. Nor does the legislative directive specify a particular method for establishing value. And courts, being under no compunction to do so, have not confined assessors to any one course. To ensure that the existence of varied and multifaceted patterns of land use and ownership does not frustrate the design that each contribute equitably to the public fisc, courts have upheld any fair and nondiscriminatory method that appears most likely to achieve that end” (Matter of Merrick Holding Corp. v Board of Assessors of County of Nassau, 45 NY2d 538, 541 [1978]; see Matter of Miriam Osborn Mem. Home Assn. v Assessor of City of Rye, 80 AD3d at 141-142).
*136 The Income Capitalization Approach
The parties agree that the income capitalization approach is the proper method for valuing the subject real property. Under this approach, value is calculated by dividing the expected income that a property can produce by a capitalization rate (see generally Matter of New Cobleskill Assoc. v Assessors of Town of Cobleskill, 280 AD2d 745, 746 n [2001]). In other words, “[v]ablation is obtained under this method by determining the rental value of the property; deducting from it the operating expenses; and, if there is a profit, capitalizing the net profit at a percentage commensurate with the amount of risk involved” (98 NY Jur 2d, Taxation and Assessment § 331; see The Appraisal Institute, The Appraisal of Real Estate 445-467, 499-517 [13th ed 2008]; Lee & LeForestier, Review and Reduction of Real Property Assessments in New York, §§ 1.08, 8.04 [3d ed 1988]).
“The capitalization of income method rests on the proposition that the value of income-producing property is the amount a willing buyer, desiring but not compelled to purchase it as an investment, would be prepared to pay for it under ordinary conditions to a seller who desires, but is not compelled, to sell (see W.T. Grant Co. v Srogi, 52 NY2d 496, 510 [1981]; Matter of Alexander’s Dept. Store of Val. Stream v Board of Assessors, 227 AD2d 549). That amount will depend on the net income the property will likely produce inasmuch as the purchase price represents ‘the present worth of anticipated future benefits’ (Arthur E. Gimmy and Buddie A. Johnson, Analysis and Valuation of Golf Courses and Country Clubs, at 117 [Appraisal Institute 2003]). The factor by which a property’s likely net income is related to its value at any particular time is the capitalization rate, which is usually derived from a study of the sales of comparable, income-producing properties, using market data including, where available, investor surveys (id. at 119). Value is arrived at under the capitalization of income method by dividing the net income by the capitalization rate” (Matter of Mill Riv. Club v Board of Assessors, 48 AD3d at 171-172).
Application of the Income Capitalization Approach For present purposes, the rent the subject property would command depends on the revenue the property is likely to real *137 ize (see Matter of Mill Riv. Club v Board of Assessors, 48 AD3d at 172). Again, the parties both estimated the expected revenue for the subject property based on the hypothetical premise that the property would be operated as a private, for-profit golf course, rather than a private, not-for-profit golf course operated only to benefit its members (see id.).
The parties also agree that, when factoring in the effect of real estate taxes on the value of the real property pursuant to the assessor’s formula, a tax load factor should be applied to the capitalization rate when operating under a gross lease assumption. Indeed, the appellants acknowledge that this Court has approved of using the assessor’s formula to account for the reduction in value attributable to real estate taxes in other cases (see Matter of VGR Assoc., LLC v Assessor, Bd. of Assessment Review of Town of New Windsor, 51 AD3d 678 [2008]; see generally Matter of Senpike Mall Co. v Assessor of Town of New Hartford, 136 AD2d 19 [1988]).
However, the appellants assert that the assessor’s formula simply is not appropriate in valuing golf courses. The appellants further assert that the methodology employed by Dugas “double counts” real estate taxes as an expense, and, as a result, fails to yield a fair market value. Thus, the crux of the dispute on this appeal is whether the Supreme Court properly adopted Dugas’s approach, in effect, converting all comparable leases that were not gross leases into gross leases, and deeming the municipal leases to be the equivalent of gross leases, for the purpose of estimating the rent-to-revenue ratio, and then applying a capitalization rate that included a tax load factor.
A very similar situation arose in Matter of Mill Riv. Club v Board of Assessors (48 AD3d 169 [2007]), a tax certiorari proceeding in which the petitioner challenged tax assessments of its land on which it operated a private, not-for-profit golf course and country club (see id. at 170). At the nonjury trial in that case, both appraisers valued the property based on its existing use, employing the income capitalization method (see id. at 171). As was done here, both appraisers calculated projected revenue “by assuming that the property would be operated, not as a private, not-for-profit country club, but as a public or semiprivate, for-profit golf course” (id. at 172). Each expert projected revenue the property would generate “taking into account, inter alia, the property’s characteristics, prevailing local, regional and national market conditions, and the income generated by comparable golf courses over the same periods”; “converted the *138 estimated revenue into a ‘market rent’ “netted the ‘market rent’ for each year by deducting administrative expenses”; and “then divided the result he reached by the capitalization rate he thought appropriate to yield the estimated market value of the property for each of the relevant tax years” (id.). As this Court explained, however,
“The two experts differed! widely as to the appropriate market rents and capitalization rates. Of particular significance, the petitioner’s expert assumed a market rent derived from a gross lease under which the property’s owner remains responsible for the payment of real estate taxes, while the County’s expert assumed a market rent derived from a triple net lease under which the tenant pays, inter alia, all real estate taxes. Consistent with his assumption, the petitioner’s expert accounted for the owner’s real estate tax burden by adding a tax factor to the capitalization rate based on the effective tax rate for each of the relevant years (see Matter of Senpike Mall Co. v Assessor of Town of New Hartford, 136 AD2d 19 [1988]). Conversely, the County’s expert, consistent with his triple net lease market rent assumption, made no adjustment in the capitalization rate for real estate taxes” (Matter of Mill Riv. Club v Board of Assessors, 48 AD3d at 172-173).
The two experts diverged in their opinions concerning whether the rents paid by tenants on those comparable properties which were tax-exempt municipal or state properties should be construed as gross leases or triple net leases (see id. at 175). Under the reasoning employed by the petitioner’s expert, since the lessees in such circumstances were not obligated to pay any real estate taxes, such leases should be deemed gross leases (see id.). Further, assuming that the majority of comparable properties were being operated under gross leases, the petitioner’s expert proposed that the market rent for the subject property should be calculated as if the hypothetical tenant operated the property under a gross lease (see id.). Under this methodology, the petitioner’s expert added a tax load factor to the proposed capitalization rate, which had the effect of further reducing the estimated value of the property (see id.).
Conversely, the respondents’ expert reasoned that, since the owners of the municipal properties were not required to pay any real estate taxes on the property, those leases should be *139 considered triple net leases (see id.). Additionally, because the respondents’ expert assumed that the majority of comparable properties were operating under triple net leases, he asserted that the market rent for the subject property should be calculated as if the hypothetical tenant would be operating the property under a triple net lease (see id.).
As the appellants here emphasize, in Mill Riv. Club, this Court observed,
“The difficulty, of course, is that the lease of a tax-exempt property does not fit neatly into either a triple net lease or gross lease category because, where the leased property is tax-exempt, neither the tenant nor the owner pays real estate taxes. Additionally, as the County itself conceded, tax-exempt municipal and state golf courses are not operated with a view toward maximizing profits; rather, they are generally designed to provide affordable play, with fee structures set by the municipality or the State to advance that goal. As a result, tenants of tax-exempt courses generally receive lower golf revenues in exchange for the tax exemption” (id. at 175-176).
As the appellants emphasize, the owner of such a property does not pay real estate taxes, as is the case with a triple net lease. However, as the Country Club emphasizes, neither does the tenant, as is the case with a gross lease, which typically has the effect of increasing the amount in rent the tenant may be expected to pay.
Affirming the Supreme Court’s determination in Mill Riv. Club, which adopted the methodology employed by the respondents in that case, this Court stated,
“We cannot conclude that the Supreme Court erred in adopting the County’s triple net lease assumption for tax-exempt comparables inasmuch as the rental income actually received by a municipality from a tax-exempt golf course, expressed as a percentage of actual revenue, can certainly be viewed as being ‘net’ of any real estate taxes. And the court reasonably took account of the somewhat reduced golf revenues generated at municipal courses by rejecting the market rent percentage of 30% for golf fees proposed by the County in favor of a reduced percentage of 27%, ‘considering all issues, including *140 a tax component.’ Contrary to the petitioner’s contention, we find that this was not error. In translating information from regulated, tax-exempt municipal comparables to the unregulated and fully taxable subject property, it was not unreasonable for the Supreme Court, based on the testimony of the County’s expert, to assume that golf revenue for the subject property would be comparatively higher, and — consistent with the court’s triple net lease assumption — would account for a correspondingly lower percentage of market rent paid to the owner.
“Additionally, inasmuch as the Supreme Court’s determination to treat the estimated market rent as triple net rather than gross is supported by competent evidence, it follows that the court did not err in declining the petitioner’s proposal to add a tax factor to the capitalization rate (see Matter of Senpike Mall Co. v Assessor of Town of New Hartford, 136 AD2d 19 [1988]). And we discern no other basis to disturb the Supreme Court’s factual findings with respect to the capitalization rates used in determining the estimated market values of the subject property for each of the relevant tax years (see Matter of Town of Islip v Mustamed Assoc., 222 AD2d 682, 683 [1995]; Matter of John P. Burke Apts. v Swan, 137 AD2d 321, 325-326 [1988])” (Matter of Mill Riv. Club v Board of Assessors, 48 AD3d at 176).
This Court’s determination in Mill Riv. Club was premised on the rules, set forth above, that “ ‘[a]ny fair and nondiscriminating method’ that will achieve the tax assessment goal of arriving at a fair market value result is ‘acceptable’ ” (id. at 176-177, quoting Matter of Gordon v Town of Esopus, 31 AD3d at 982; see Matter of Saratoga Harness Racing v Williams, 91 NY2d at 643), and that “ ‘valuation remains largely a question of fact, and the courts have considerable discretion in reviewing the relevant evidence as to the specific property before them’ ” (Matter of Mill Riv. Club v Board of Assessors, 48 AD3d at 177, quoting Matter of Consolidated Edison Co. of N.Y., Inc. v City of New York, 8 NY3d at 597).
Although the valuation method accepted in Mill Riv. Club was different from the method accepted by the Supreme Court in the case at bar, we nevertheless conclude that it was within the Supreme Court’s discretion to determine that the approach *141 advocated by the Country Club’s appraiser was the most appropriate under the circumstances. Specifically, we conclude that the court did not err in adopting the Country Club’s approach, assuming the majority of comparable properties were operating under gross leases or, in the case of the municipal leases, the equivalent thereof; “grossing up” the leases where appropriate, assuming the subject property would operate under a gross lease; and employing the assessor’s formula, including a tax load factor in the capitalization rate. The evidence in the record establishes that the methods advocated by the Country Club were fair and nondiscriminating, and were therefore “ ‘acceptable’ ” (Matter of Mill Riv. Club v Board of Assessors, 48 AD3d at 177, quoting Matter of Gordon v Town of Esopus, 31 AD3d at 982).
Inasmuch as municipal leases do “not fit neatly into either a triple net lease or gross lease category because, where the leased property is tax-exempt, neither the tenant nor the owner pays real estate taxes” (Matter of Mill Riv. Club v Board of Assessors, 48 AD3d at 175), such leases can be readily characterized either as gross leases, since the lessee does not pay taxes, or as triple net leases, since the owner does not pay taxes. Therefore, Dugas could justifiably claim that the majority of leases examined are gross leases, and that the Country Club’s hypothetical lease also should be considered a gross lease. Meanwhile, Hughes could justifiably claim that these leases are triple net leases, and that the Country Club’s hypothetical lease should be considered a triple net lease.
For each of the municipal leases analyzed, Dugas concluded that, because the lessee was not required to pay real estate taxes, “the operator could afford to pay a higher percentage of sales than a privately owned facility.” In other words, the leases were the equivalent of gross leases. In computing the rent-to-revenue ratio for the comparable properties, Dugas “grossed up” the triple net lease by 3% to account for the fact that the lessee paid the real estate taxes, and he also “grossed up” the hybrid lease by adding 0.7% to account for the payment in lieu of taxes. He made no similar adjustments to the municipal leases, since he deemed them to be the equivalent of gross leases. Having “grossed up” the leases where appropriate, Du-gas was able to compare the leases as if they were all of the same type.
Additionally, as this Court observed in Mill Riv. Club, tax-exempt golf courses operated on land leased by a municipality *142 often have fee restrictions imposed by the municipality, as such courses “are not operated with a view toward maximizing profits; rather, they are generally designed to provide affordable play, with fee structures set by the municipality or the State to advance that goal” (Matter of Mill Riv. Club v Board of Assessors, 48 AD3d at 176). In Mill Riv. Club, this Court determined that the Supreme Court properly accounted for these “somewhat reduced golf revenues generated at municipal courses” by adopting a rent-to-revenue ratio reduced from 30% to 27% (id.). Here, we find that the Supreme Court properly concluded that the Country Club proposed a different “fair and nondiscriminating” method to account for these circumstances, which was also acceptable (Matter of Saratoga Harness Racing v Williams, 91 NY2d at 643; see Matter of Mill Riv. Club v Board of Assessors, 48 AD3d at 176-177; Matter of Gordon v Town of Esopus, 31 AD3d at 982). In analyzing the comparable municipal properties, Dugas noted that there was a pressure or restriction on the tenant to keep rates reasonable for residents. In light of this circumstance, Dugas, in estimating the rent, made upward adjustments for “economic factors.” Once Dugas made a gross lease assumption for the tax-exempt municipal properties, it was necessary for him to then make upward adjustments to the rent-to-revenue ratios to account for the realities of municipal ownership in order to make those ratios more analogous to those found in the case of true gross leases. In using the gross lease factors thereafter, it was proper to add a tax load factor to the capitalization rate to “reflect the fair burden of taxes.” We deem this method of accounting for the municipality’s control over fees and policy to be acceptable.
Again, this Court has previously approved of the implementation of the assessor’s formula In connection with the income capitalization approach to the valuation of real property for tax assessment purposes (see Matter of VGR Assoc., LLC v Assessor, Bd. of Assessment Review of Town of New Windsor, 51 AD3d 678 [2008]), although those proceedings involved assessments of property on which a shopping center, rather than a golf course, was operated. As Dugas emphasized, it is logical to add a tax load factor to the capitalization rate rather than deducting taxes as an expense in the rent-to-revenue ratio calculation; the assessor’s formula avoids the situation of including in the rent-to-revenue ratio calculation the very value that is challenged as excessive. Contrary to the appellants’ contentions, we conclude that there is no basis to categorically preclude the application of *143 this approach to the valuation of golf courses. Further, under the circumstances of this case, we conclude that the methodology employed by the Country Club yielded a fair market value, and we discern no reason to disturb the Supreme Court’s determination on appeal.
Conclusion
In conclusion, contrary to the appellants’ contention, the Supreme Court did not engage in “double counting” when it adopted Dugas’s approach; since the court proceeded with the gross lease assumption, real property taxes were not a part of the equation until factored into the capitalization rate. It was reasonable to accept Dugas’s gross lease assumption, based, inter alia, on his determination to treat the municipal leases as gross leases because the tenants thereunder were not required to pay real estate taxes since the property was tax exempt. Moreover, in treating the municipal leases as gross leases, Dugas properly made adjustments to the rent-to-revenue ratio in order to account for any restrictions which might be placed on greens fees. At the same time, it was proper to add a tax load factor to the capitalization rate in order to account for the cost of real estate taxes (see Matter of Senpike Mall Co. v Assessor of Town of New Hartford, 136 AD2d 19 [1988]). Thus, the Country Club proved by a preponderance of the evidence that its property was overvalued (see generally Matter of Century Realty, Inc. v Commissioner of Fin., 15 AD3d 652, 654 [2005]).
Accordingly, the order and judgment is affirmed insofar as appealed from.
Dillon, J.E, Hall and Austin, JJ., concur.
Ordered that the order and judgment is affirmed insofar as appealed from, with costs.