[1 NYS3d 793]

In the Matter of RITE AID CORPORATION, Petitioner, v CITY OF
TROY BOARD OF ASSESSMENT REVIEW et al., Respondents.

Supreme Court, Rensselaer County, February 5, 2015

**APPEARANCES OF COUNSEL**

*Robert L. Jacobson* for petitioner.

*Ian H. Silverman, Corporation Counsel (Daniel G. Vincelette of counsel), for City of Troy, respondent.*

### OPINION OF THE COURT

PATRICK J. MCGRATH, J.

Petitioner, a lessee under a 20-year lease of a freestanding retail pharmacy located at 272 Hoosick Street in the City of Troy, commenced proceedings pursuant to RPTL article 7 to challenge the assessment imposed for each of the tax years 2011, 2012, and 2013.

Both parties sought summary judgment prior to trial. The City argued that a recent Third Department decision, *Matter of Rite Aid Corp. v Otis* (102 AD3d 124 [3d Dept 2012]), was dispositive in its favor. In that case, the Court held that

> "[a]lthough the proper valuation of stand-alone, national retail pharmacies with long-term leases has been the subject of six prior appeals to this Court—and much debate—it is well settled that [t]he best evidence of value . . . is a recent sale of the subject property between a seller under no compulsion to sell and a buyer under no compulsion to buy." (*Id.* at 126-127 [internal quotation marks and citations omitted].)

The Court further held that the sale of the property in question was an arm's length transaction, and that "the price paid by the purchaser in this matter was consistent with the value of the property as determined by respondents' expert (subject to market trends)." (*Id.* at 127.) "Under these circumstances, Supreme Court's decision to credit the appraisal offered by petitioner was against the weight of the evidence." (*Id.*)

The City argued that it was entitled to summary judgment because there was an arm's length sale of the property in question in the instant matter. In a decision and order dated May 16, 2014, this court found that *Otis* "is the Third Department's most recent articulation of the law governing this case, which this Court is bound to follow," and therefore, "any trial court would be required to reject petitioner's claim that retail sale and leases provide better evidence of fee simple market value tha[n] a normal arm's length transaction of recent vintage." However, this court also noted that the *Otis* decision (and all prior cases in that line of precedent) concerned decisions rendered after trial, which focused on an assessment of the expert witness' credibility. Additionally, unlike *Otis*, the sale

price and the assessed price were not "consistent," and therefore, the court denied the motion.

The matter was tried before this court on June 11, 2014. Petitioner's appraiser testified that he utilized three methods to determine a capitalization rate (or "cap" rate). The first method was using four sales wherein he claims that he derived the capitalization rate by dividing the net operating income by the sale price. However, on cross-examination, it was established that his report only provided income for items 1 and 2. The report does not include expenses associated with any of the four comparables. Petitioner's report indicates that "the rates were obtained from income and expense statements provided at the time of sale and/or through discussions with the brokers involved in the sales." The rates for the four comparables were as follows:

| Number | Name | Overall Capitalization Rate |
|--------|------|------------------------------|
| 1 | Tractor Supply | 6.71 |
| 2 | Staples | 7.05 |
| 3 | Former Rite Aid | 9.67 |
| 4 | Dollar Tree | 8.26 |

The appraisal report indicated that "given the subject's specific location in the market, we would expect the subject's cap rate to fall towards the middle of the range" and that a cap rate of 8.5% was appropriate.

Petitioner's appraiser also testified that he used two additional methods to determine the cap rate: Korpacz surveys and the Debt Service Coverage Ratio Formula.

After the petitioner rested, respondent moved to dismiss, relying primarily on a recent Court of Appeals case, *Matter of Board of Mgrs. of French Oaks Condominium v Town of Amherst* (23 NY3d 168 [2014]). This court granted the motion, but allowed petitioner to bring the instant motion to reargue.

Discussion

A motion to reargue shall be based upon matters of fact or law allegedly overlooked or misapprehended by the court in determining the prior motion, but shall not include any matters of fact not offered on the prior motion. (CPLR 2221 [d] [2].)

The assessment for each year under review enjoys a presumption of validity. The petitioner must produce substantial evidence to overcome the presumption. (*Matter of FMC Corp. [Peroxygen Chems. Div.] v Unmack*, 92 NY2d 179, 187 [1998].) It is well established, and uncontested in this proceeding, that

petitioner can overcome the presumption by demonstrating the existence of a valid and credible dispute as to value, typically in the form of a "detailed, competent appraisal based on standard, accepted appraisal techniques and prepared by a qualified appraiser." (*Matter of Niagara Mohawk Power Corp. v Assessor of Town of Geddes*, 92 NY2d 192, 196 [1998].) The ultimate strength, credibility and persuasiveness are not germane for the threshold inquiry. The court's inquiry is limited to a determination of whether the documentary and testimonial basis proffered by the petitioner is based upon sound theory and objective data. (*Id.*)

In *French Oaks*, a condominium board submitted an appraisal report in which its appraiser applied an income cap method to establish value. The Court held that the first step required determination of the net operating income of the condominiums. The second step was determination of the appropriate cap rate. "This can be accomplished by taking the annual net operating income of a comparable and dividing that figure by its sale price." (23 NY3d at 171, citing Appraisal Institute, The Appraisal of Real Estate at 514 [11th ed 1996].) The Court held that "[t]o compute the net operating income for the four comparables, the appraiser had to ascertain their gross incomes and expenses." (*Id.* at 172.) Although the appraiser offered specific figures for these items in his report, he indicated that they were derived from what he referred to as "forecast financials." (*Id.*) The appraiser did not explain how he arrived at these income and expense figures and "did not otherwise identify the sources for this component." (*Id.*)

The Court noted that it had not previously analyzed Uniform Rules for Trial Courts (22 NYCRR) § 202.59 (g) (2), which states that

"[t]he appraisal reports shall contain a statement of the method of appraisal relied on and the conclusions as to value reached by the expert, together with the facts, figures and calculations by which the conclusions were reached. If sales, leases or other transactions involving comparable properties are to be relied on, they shall be set forth with sufficient particularity as to permit the transaction to be readily identified, and the report shall contain a clear and concise statement of every fact that a party will seek to prove in relation to those comparable properties. The appraisal reports also may contain photographs of the property under review

and of any comparable property that specifically is relied upon by the appraiser, unless the court otherwise directs."

However, the Court reviewed well established case law which holds that "an appraisal should be disregarded when a party violates section 202.59 (g) (2) by failing to adequately 'set forth the facts, figures and calculations supporting the appraiser's conclusions.' " (*French Oaks* at 176 [citations omitted].)

The Court focused on the second step of cap rate analysis provided by the Board's appraiser, noting that

"[s]ince net operating income is one half of the equation in determining the capitalization rate (net operating income divided by sales price), an accurate calculation is of paramount importance. But other than referencing 'forecast financials,' the appraiser did not provide the sources of the income or expense figures related to each comparable (*see* [Appraisal Institute, The Appraisal of Real Estate at 514 (11th ed 1996)] ['Data on each property's sale price, income, expenses, financing terms, and market conditions at the time of sale are needed'])." (*Id.* at 176-177.)

The Court also noted that the "hearing testimony of the Board's appraiser revealed that he had little to no confirmable data to support the income and expense numbers he employed to derive the capitalization rate." (*Id.* at 177.) When pressed, he proffered that the relevant figures were based on his "personal exposure" to the complexes, i.e., his own unverifiable knowledge. (*Id.*)

The Court ultimately held that "[s]imply put, the record before us affords no basis to check or test whether the net operating incomes for these four properties—and the capitalization rates adduced from them—were valid, or even in the ballpark." (*Id.* at 177.) The Court held that

"although the substantial evidence standard is not a heavy one, the documentary and testimonial evidence proffered by petitioner [must be] based on sound theory and objective data. The Board in this case failed to meet this threshold because its appraiser did not support the proposed capitalization rate with objective data necessary to substantiate the component calculations." (*Id.* [internal quotation marks and citation omitted].)

In support of the motion to reargue, counsel for the petitioner argues that its appraisal report provided net income for com-

parables 1 and 2 (Tractor Supply and Staples). Counsel claims that in the case of a net lease property, expenses are "minimal" and unnecessary to the equation. Petitioner claims that a cap rate can be supported by two valid sales.

If the court does not find that the two comparables provide sufficient information, counsel argues that the cap rate was independently supported by other sources, such as the statements from real estate brokers involved in the sales transactions, as well as the Korpacz survey prepared by a national accounting firm, and the Debt Service Coverage Ratio Formula.

Counsel argues that the Korpacz survey, published by PricewaterhouseCoopers, is widely recognized as an authoritative source for cap rates, and is not the same as the "forecasts" criticized in *French Oaks*. Additionally, that the use of third-party statistical surveys is sanctioned by The Appraisal of Real Estate. Additionally, The Appraisal of Real Estate also sanctions the Debt Service Coverage Ratio Formula, however, only in cases where the "available market data is scarce or not reliable." (The Appraisal of Real Estate at 497.) There is no evidence in the instant record to establish that the available market data was scarce or unreliable.

Petitioner also cites *Matter of Adcor Realty Corp. v Srogi* (54 AD2d 1096, 1096 [4th Dept 1976]), wherein the Assessment Commissioner claimed that it was error to admit into evidence statistical abstracts regarding nationwide department store percentage leases "which were at least indirectly relied upon by petitioner's appraiser in determining the net rental income of the subject property," and relied upon by the trial court in making its assessment. The Court held that

> "[a]lthough an exception to the rule permits hearsay, such evidence must be introduced upon proper foundation (see, generally, Richardson, Evidence [10th ed], § 349). The testimony of petitioner's expert that these bulletins were carefully compiled by the National Institute of Real Estate Brokers and that they were relied upon by real estate consultants in making appraisals was more than an adequate foundation for their introduction. Nor did the admission of these abstracts contravene 22 NYCRR 1024.24 (b). Their inclusion with petitioner's appraisal sufficiently apprised respondent of the reliance placed upon these abstracts." (*Id*.)

Petitioner also relies on *Matter of Frontier Park v Assessor of Town of Babylon* (293 AD2d 608, 609 [2d Dept 2002]), wherein

the Court held that petitioner satisfied its initial burden of overcoming the presumption of validity of the assessments of the mobile homes located in its trailer park. The Court held that the

> "petitioner relied on the expert testimony of an experienced certified real estate appraiser, who determined the value of the homes based on a pricing guide which reflects retail sales of mobile homes throughout the United States. Although a properly performed appraisal utilizing comparable sales in close proximity to the petitioner's trailer park may be a superior method of determining the market value of the mobile homes, use of the subject pricing guide is a recognized method of appraisal of mobile homes. The failure of the petitioner's expert witness to rely upon local comparable sales, and to adequately adjust the pricing guide figures to reflect the location of the subject trailer park, are deficiencies which go to the weight of the evidence. Such alleged omissions are not relevant to determining the threshold issue of whether the petitioner sustained its initial burden of coming forward with substantial evidence to show that a valid dispute exists over the value of the mobile homes." (*Id.* [citations omitted].)

Petitioner's counsel argues that *French Oaks* and Uniform Rules for Trial Courts (22 NYCRR) § 202.59 require an appraiser to disclose his sources, so as to avoid surprise at trial. As noted in *Adcor Realty Corp. v Srogi*, under the "professional reliability exception," an expert may rely on hearsay so long as the evidence is the type relied upon by appraisers to render an opinion.

Counsel for the respondent argues that petitioner's appraiser did not provide the income and expenses necessary to compute the net operating income, and that this is deficient under *French Oaks* because his cap rate was not supported by objective verifiable data necessary to substantiate the component calculations. Further, that the sales comparison methodology provided by petitioner's appraiser has been discredited by the Third Department because in this case, the property sold in an arm's length transaction. (*Matter of Rite Aid Corp. v Otis*, 102 AD3d 124 [3d Dept 2012].)

The court notes that the petitioner provides the court with what appears to be the record on appeal from the *French Oaks*

decision. Respondent objects to its consideration, as it was not before the court during the trial. The court agrees, and limits the record to the transcript of the trial, and the decisional law.

Writing for the Court in *French Oaks*, Judge Graffeo noted that "[d]eriving capitalization rates from comparable sales is the preferred technique when sufficient data on sales of similar, competitive properties are available." (23 NY3d at 176.) Additionally, that "[d]ata on each property's sale price, income, expenses, financing terms, and market conditions at the time of sale are needed." (*Id.* at 177.) Opposing counsel, and the court, must be able to "check or test" whether these figures, "and the capitalization rates adduced from them," are valid. (*Id.*)

The appraiser in *French Oaks* provided all necessary figures, including income and expenses, but the Court found that this data was not "objective" or verifiable because the numbers were a product of the appraiser's "personal exposure" to the complexes. (*Id.*) In the instant matter, the first two comparables list the income, but do not provide any information concerning expenses. Comparables 3 and 4 rely completely on information from brokers. Neither income nor expenses are provided. While counsel for the petitioner has attempted to downplay the role of expenses in this specific type of lease, his expert testified that the triple net lease "minimize[s] the impact of expenses, but there are obviously expenses that need to be paid and estimated. It's just the tenant pays for—for the expenses during the period of occupancy." (Trial tr at 76.)

*French Oaks* is clear as to the well established steps necessary to arrive at a cap rate and the information necessary to make these calculations. Some of this information is missing from petitioner's appraisal report, and therefore, the court agrees with respondent that the petitioner's appraiser's own calculations are deficient under *French Oaks* because he does not provide "[d]ata on each property's sale price, income, expenses, financing terms, and market conditions at the time of sale" (23 NY3d at 177). Neither opposing counsel nor the court can "check or test" whether these figures, "and the cap rates adduced from them" are valid. Thus, the income approach, as calculated by the petitioner's appraiser, cannot sustain the petitioner's initial burden.

Petitioner also claims to have relied upon the Korpacz Real Estate Investor Survey as a source for his 8.5% cap rate. (*See* Self Contained Appraisal Report of Freestanding Retail Build-

ing 272 Hoosick Street, City of Troy, New York [petitioner's exhibit 1] at 75.)

*French Oaks* did not address whether the petitioner's appraiser was required to provide his own cap rate based on his own comparables in order for petitioner to sustain its threshold burden or whether the appraiser could rely on evidence such as the Korpacz survey, which has pre-calculated cap rates, as a primary source. Respondent's position suggests that the only way to adduce a cap rate is for the petitioner's appraiser to have audited financial statements for the comparable sales in hand to calculate the net operating income for those properties, which will in turn be used to calculate the cap rate. This court does not find that *French Oaks* requires this. The fatal deficiency identified by the Court in *French Oaks* was that the appraiser simply relied on his own personal experience, without any objective data to support his numbers. The Court did not eliminate the possibility that the cap rates could be obtained from other sources.

Petitioner's appraiser in the instant matter testified that appraisers routinely rely upon national surveys such as Korpacz. Case law in this area confirms that Korpacz surveys are recognized as sound theory and objective data with respect to cap rates. (*See Matter of Miriam Osborn Mem. Home Assn. v Assessor of City of Rye*, 80 AD3d 118, 131 [2d Dept 2010] [expert used Korpacz, but modified the cap rate after taking into account "features of the property that made investment in it more risky and less attractive than property devoted solely to residential apartments, as well as land-use restrictions and a declining or flat rental market in Westchester County"]; *Heron Realty Corp. v New York State Urban Dev. Corp.*, 40 Misc 3d 1202[A], 2013 NY Slip Op 51003[U], *6 [Sup Ct, Kings County 2013] [noting that "(d)etermining an appropriate cap rate that is not derived from actual sales is always somewhat subjective," the court agreed with the appraiser, who determined the cap rate of 9.5% through adjustment to Korpacz, specifically, that New York City "is generally 1½ to 2 points lower than the national cap rate"]; *Matter of Target No. 1954 v Board of Assessors*, 37 Misc 3d 1223[A], 2012 NY Slip Op 52147[U], *7-8 [Sup Ct, Westchester County 2012] [the appraiser consulted Korpacz for cap rates, however, the appraiser concluded that the cap rate should be higher than the ground lease purchase by 125 basis points based on several factors of "additional risk." The court found that the petitioner submitted substantial evi-

dence based upon "sound theory and objective data" and had demonstrated the existence of a valid dispute concerning the propriety of the assessments]; *cf. Retail Prop. Trust v Board of Assessors*, 20 Misc 3d 1127[A], 2008 NY Slip Op 51641[U] [Sup Ct, Nassau County 2008]; *see also* The Appraisal of Real Estate at 499 ["surveys can give appraisers an overall picture of current return requirements (in contrast to historical data)"].)

In the petitioner's appraisal report, it states that "[a]nother method for establishing an overall cap rate is to review the criteria of major investors in the marketplace. This may serve as a check against other techniques or may be a primary source when ample data exists." (Petitioner's appraisal report at 75.) Petitioner's appraisal report provides a chart with information derived from the Korpacz Real Estate Investor Survey. The chart indicates the average overall capitalization rates for national strip shopping malls for the third quarters of 2010 (8.09%), 2011 (7.20%), and 2012 (7.06%). The report further indicates that the data from the Korpacz survey generally reflects rates from major metropolitan areas, whereas the subject location is within a "secondary metropolitan market." The report states that

> "[c]apitalization rates in the subject's region are typically 50 to 150 basis points (0.50 to 1.50) higher than indicated by the investor survey, as supported by regional sales. The capitalization rate reflects the quality and duration of income stream as well as the physical and locational characteristics of the property."

The report notes that retail values in the subject region declined in 2009 based on the "national economic crisis" which caused capitalization rates to increase, based on "higher risks and tougher financing requirements." "While the national investor survey indicates that average capitalization rates on [sic] the U.S. declined between 2010 and 2012, regional trends have remained relatively stable. As such, we have concluded a capitalization rate of 8.5% as of July 1, 2010, July 1, 2011, and July 1, 2012."

Thus, the petitioner's appraiser reviewed the widely regarded Korpacz Real Estate Investor Survey for the relevant years, and made adjustments based on the type of market, the specific region, and regional capitalization trends, exactly what the appraisers did in *Matter of Miriam Osborn Mem. Home Assn. v Assessor of City of Rye, Heron Realty Corp. v New York State*

*Urban Dev. Corp.* and *Matter of Target No. 1954 v Board of Assessors*. As noted above, *French Oaks* held that if the petitioner formulates a cap rate based on his or her own comparables, petitioner must provide the computational components so that they can then be verified. *French Oaks* did not address the Korpacz or other investor surveys as a source for a cap rate. Respondent criticizes the survey because it provides national rather than regional data, and notes that the survey includes lower rates than the 8.5% used by the petitioner. However, these arguments go to the ultimate strength, credibility and persuasiveness of the evidence, not the threshold inquiry of whether the documentary and testimonial basis proffered by the petitioner is based upon sound theory and objective data. The Korpacz Real Estate Investor Survey is considered sound theory and objective data, and gives the "ballpark" evidence that Judge Graffeo alluded to in *French Oaks*. Therefore, the court agrees with petitioner that dismissal was not warranted at the conclusion of the petitioner's proof.

Accordingly, it is hereby ordered that petitioner's motion for leave to reargue is granted to the extent that the respondent's motion to dismiss at the close of the petitioner's proof is denied. The trial shall be rescheduled for respondent to present its proof.